*339
 
 * Gardiner, J.
 

 The defendants, Pell and wife, object to the validity of the bond and mortgage in controversy. 1. Upon the ground of usury: 2. Upon that of fraud on the part of the association. There is no foundation for the first objection, in the pleadings; nor for the second, in the proofs.
 

 The case shows that Pell intended to exchange, and did exchange, his bond and mortgage for the stock of the company; that, when issued to him, it was worth ninety-eight cents upon the dollar; that he has disposed of it according to the purpose stated by him in his answer, and. has received and appropriated the avails to his own use. The defence, if successful, would give him $15,000 in the stock of the association, or its proceeds, without consideration, and enable him to cast upon the creditors and
 
 bond fide
 
 stockholders of the company, the loss arising from his own improvidence.
 

 If these defendants were at liberty to insist upon the fraud of the original subscribers, in bar of this suit, a question upon which we express no opinion, the fraud must be proved. This *has not been done, as we all agreed, upon the first argument, and nothing has been shown, upon the present hearing, to change that opinion. [ *340
 

 Assuming the validity of the bond and mortgage, the only remaining question will be, whether the state of Ohio, through the agreement and assignment stated in the bill, obtained such a title to the securities, as will be recognised and enforced in a court of equity. The determination of this question involves a consideration of the nature and extent of the powers conferred upon the association by the act of 1828, “
 
 to authorize the bvMness of banking.”
 

 And, first, this was a corporation, and a moneyed corporation. This was, in effect, decided in
 
 Gillet
 
 v.
 
 Moody,
 
 in this court (3 N. Y. 485), and in previous cases, to-which reference is there made. In the language of
 
 *340
 
 Judge Bronson, they are not corporations within the intent and meaning of a particular statute; but are corporations to all intents and purposes.
 

 In the second place, the association is a
 
 banking
 
 corporation. It was organized under“ an act to authorize the business of bankingnot an act for that and other purposes. The 18th section of the statute provides, that “ such association shall have power to carry on the business of banking,” by the exercise of the express powers there enumerated, and of such “incidental powers as shall be necessary to carry on such business.” This provision is merely declaratory of the doctrine of the modern decisions, that “all corporations possess such powers as are specifically granted by the act of incorporation, or such as are necessary for the purpose of carrying into effect the powers expressly granted, and no others.” (2 Kent’s Com. 298; 4 Wheat. 636; 4 Hill 443.)
 

 In the third place, this association, as a banking corporation, was subject to all general laws relating to.that class of corporations, except in so far as those laws, or some of their particular provisions, have been modified or superseded by the act of 1838, under which this institution was organized, and by subsequent statutes. This proposition is the necessary result of the decision in
 
 Supervisors of Niagara
 
 v.
 
 People
 
 (7 *Hill 504) and G
 
 illet
 
 v.
 
 Moody,
 
 in this court. If banks, organized under this law, are subject to taxation, and to the act to prevent the insolvency of moneyed corporations, as settled by these adjudications, no reason is perceived, why they are not bound by all general laws relating to moneyed corporations, not in conflict with the one under which they were created. It was argued, that we are to look for their j attributes, powers and responsibilities, exclusively to the law of 1838, and to the laws amending it subsequently
 
 passed;
 
 and that “ the authority to associate upon the terms and conditions, and subject to
 
 *341
 
 the liabilities prescribed by the act, as expressly pro vided by the "15th section, excludes any reference to oi liability under former statutes.” This argument proves too much; since the principle on which it rests would apply, with the same propriety, to the common law as to legislative enactments, and these associations would consequently be exempted from responsibility to any law not recognised by this particular statute. The 15th section merely affirms that the terms and conditions imposed by the law of 1838 are obligatory upon all associations thereafter to be organized in pursuance of its provisions. It does not, by any just implication, exclude the obligation of any other law applicable to the same subject, and consistent with those “terms and conditions.”
 

 Again, if the legislature intended to authorize the creation of banking corporations, we cannot suppose, that they designed to provide for a privileged class, by exempting them from restrictions imposed upon all others, and deemed necessary to protect the public and stockholders against, the fraud or improvidence of the agents who controlled them. If they had no such intention, as the counsel for the complainants insists, the laws then existing in reference to moneyed corporations, would have no application to these associations: of course, as an exemption from their operation, in terms, would be superfluous, if not absurd, it ought not to be implied from the provisions of the 15th section.
 

 Assuming this to be the character of this association, and these the obligations imposed upon it by the statutes of this state, the question is presented, whether its *officers, in issuing the certificates of deposit ^ mentioned in the bill, and in assigning the bond and mortgage as security for their payment, or in the transaction and agreement leading to that assignment, violated the provisions of any statute obligatory upon them, or transcended the powers given them by
 
 *342
 
 law, or the articles of association under which the company was organized.
 

 The transaction which resulted in the issuing of the certificates, and the assignment of the bond and mortgage in controversy, was, in substance, as follows: The bank had, previously, according to the testimony of the president, purchased, for the purpose of sale, $800,000 of Ohio state bonds, for which they had given their certificates of deposit, payable at different periods. Of this sum, $200,000 remained due and unpaid prior to and on the 22d of November 1839. This sum the company were unable to pay, as their certificates matured, and with a view to provide the means of payment, or in order to extend the time of credit, a negotiation was opened with the commissioners of the state of Ohio, for the purchase of $230,000 of state bonds, redeemable in 1860. These bonds were to remain in the hands of the agent of that state, to be sold, a part in England, and a part in this country, on account of the company, and the proceeds to be applied to the payment of the old debt. In part execution of this arrangement, the agreement of 22d November 1839, was executed, by which Ohio stipulated to sell, and the bank to purchase, $230,000 of said bonds; Ohio to receive in payment certificates of deposit of the company, payable at a future day, to the amount of $238,000, as therein described. To secure the payment of the certificates, as they respectively fell due, the bond and mortgage mentioned in the bill, with others, in the aggregate amounting to $239,000, were to be assigned to trustees, and guarantied by the .association; the securities to be enforced, upon failure of the company to pay the certificates, or any of them, as they matured.
 

 Rejecting particulars, not important in this litigation, the arrangement was a purchase of stock by the bank, upon their notes or certificates, payable at a future day,
 
 *343
 
 the stock to be *sold by the state of Ohio on ^ account and at the risk of the company, the pro- *- ceeds to be applied to the payment of other certificates of the same .character, held by the vendor, as creditor of the bank.
 

 In the most favorable view for the complainants, the transaction can only be sustained, upon the broad ground that this association, and all other banking incorporations, have the right, as
 
 incident to their business,
 
 to trade in stocks and all other personal property, for cash or upon credit, unless specially forbidden by their charter, and that their contracts, whether in the form of post-notes or otherwise, are binding upon the association and its creditors. A claim, therefore, to
 
 traffic
 
 in stock, as a species of personal property, is distinctly asserted by the learned counsel for the complainants, under the fourth subdivision of his first point.
 

 In considering this proposition, it may be conceded, that this association could purchase stocks, to deposit with the comptroller- as security for their circulating notes; that they might invest their surplus funds in them, or loan money upon them, by way of discount, or when received in pledge, and that, as a consequence, they might lawfully acquire a title to such security, when sold to enforce a lien, or by process of law, in order to obtain satisfaction for a debt due to the corporation. All these powers are incident to the express power to conduct the business of banking. They have authority to loan money, to become creditors, and must have the right to secure and to collect the debts thus contracted.
 

 But all this is very different from an unlimited authority to traffic in stocks, for any purpose which the directors might deem advantageous- to the corporation. This association, at the time of this transaction, was not seeking to invest their surplus capital, for they had none, but were purchasing, as a means of raising money, to supply a present exigency. They did not discount the bonds of Ohio, as was intimated on the argument, “for this, in banking, is only a mode of loaning money;” they purchased them, as the whole arrangement shows, as an indirect means of borrowing. Nor did they obtain the bonds as a “basis *of an exchange account, under the power to buy and sell bills of exchange,” even if the right to acquire them for that purpose was given by the 18th section of the law of 1838 — because the stocks were held, and the proceeds were to be applied, by the vendor, upon a debt due from the vendee, according to the express terms of the agreement. In a word, they purchased these bonds, as they might have purchased a cargo of cotton, to send to market, to be sold at the risk of the vendor, for the highest price that could be obtained. No authority to traffic in either commodity is expressly given by the law of 1838; it is, therefore, claimed as a power incident to the business of
 
 banking.
 
 But the 18th section of the act declares, that this business shall be carried on, by discounting bills, notes and evidences of debt, by loaning money on real and personal security, by buying and selling gold and silver bullion, foreign coin and bills of exchange, &c; The subjects pertaining to the business of banking are designated, and the express powers of the association are limited to them, and to such incidental powers as may be necessary to transact the business thus defined by the legislature.
 

 It was said, that the special restrictions imposed upon this corporation by the 24th section of the act of 1838, were limited to the purchase and sale of real estate, and that this justified the inference, that the legislature did not intend to prohibit them from dealing in stocks or personal property. The argument amounts to this: that a corporation restrained by its charter from engaging in one kind of business, may legally embark in every other. This association might have employed its funds in shipbuilding or manufacturing, neither of which is expressly
 
 *344
 
 prohibited. The answer to this view is, first, that the absence of restriction as to the employments last mentioned, does not make them incident to the business of
 
 banking,
 
 which is the point to be established; and secondly, that this particular statute affirms that associations organized under it, shall exercise such powers as shall be necessary to carry on the business for which they were incorporated.
 

 We were told, that prohibitions against dealing in stocks "'were inserted in all bank charters granted in this state from 1791 to 1836, and that this is an authoritative admission that the general power of banking would confer that of trading in stocks. I view it rather as an unequivocal declaration by successive legislatures, that trading in stocks was not, in the language of this act “necessary to carry on the business of banking,” or they would not have prohibited it. Restrictive clauses introduced into bank charters, from an abundance of caution, prove nothing in favor of the complainants. If trading in lands, stocks and merchandise is an incident of banking, then the prohibition was operative and necessary; if not, then an affirmative power to that effect, in respect to any one of them, cannot be inferred from a prohibition of the others. And finally, the 18th section of the statute of 1838 contains an express grant of power to these associations “to deal in bullion, foreign coins and bills of exchange;” in short, authority to deal in certain kinds of personal property and evidences of debt — state stocks are not mentioned in the section. If the maxim,
 
 expressio unius,
 
 &c., as the complainants insist, is applicable to a
 
 prohibition,
 
 it certainly should be to a
 
 power,
 
 more especially, when the course of legislation, for forty years, has denied that the power sought to be implied is either necessary or expedient to accomplish the purpose for which banks are instituted.
 

 We are referred to the 5th section, which authorizes
 
 *345
 
 the comptroller, in his discretion, to
 
 change stocks
 
 deposited with him as security, for others; and to the 29th section, which requires the bank, in its semi-annual return, to state the shares of stock held absolutely and as collateral security, specifying the number and value of each — as recognising the right of the corporation to hold, as owners, stocks not deposited with the comptroller. There can be no doubt, that they have such right. Stocks hypothecated or pledged as security, may be sold in satisfaction of the debt thus secured, and purchased by the corporation, and so may real estate, and both must accordingly be embraced in the return required by the 26th section. These stocks might be exchanged, with the consent of the state, for stocks previously deposited.
 

 Again, the articles of association of this company declare *that its legal existence shall terminate -* in the year 2301. The stocks by them originally lodged with the comptroller, would probably be redeemable in the course of four centuries, and if they expected to continue business, they must have the right to substitute other stocks in their place, anp, of course, possess the right of obtaining them for t1 „c purpose. What is true of this corporation, won1 be true of any other organized under the same sAtute; hence, the necessity for the provision in question. The evidence then derived from the statute only proves, what has never been denied, that this corporation and every other bank may, for certain purposes, become the purchasers of stocks. The proposition to be established, however, is the right to
 
 traffic
 
 in them, or to require them for the special objects contemplated by the arrangement of the parties in this case; and these sections, I think, neither prove nor tend to prove any authority of that nature.
 

 It was urged, that this was the case of an executed contract, and although illegal, the assignment of the securities cannot be recalled or impeached by the re
 
 *346
 
 ceiver. The certificates of deposit, it is true, as the agreement recites, were received in payment for the stock sold by Ohio, and the mortgage as collateral security for their
 
 payment;
 
 but this is not an executed agreement, within the meaning of the authorities cited by the complainants. If the
 
 promise
 
 to pay, contained in the certificates, was a satisfaction of the debt incurred by the purchase, the complainants have no place in court; they have received all for which they stipulated. But they, in fact, are seeking' a performance of the promise, by means of the mortgage assigned to secure that performance. The promise arising from an illegal consideration is void, and the assignment, which by the terms of the agreement was specifically made to secure the payment of the certificates, is void also. It might as well be contended, that a note secured by the assignment of a mortgage for a gaming debt, or for money loaned at a usurious rate of interest, was an agreement executed.
 

 The complainants claim title to the security through the illegal contract, and not by virtue of a distinct and independent ^agreement in satisfaction of it. In such cases, the maxim
 
 melior est conditio defend-
 
 *-
 
 antis
 
 would apply, if the receiver represented the association exclusively; but he is, in fact, a trustee, not only for the stockholders but creditors also. (3 N. Y. 488.)
 

 Without, therefore, inquiring whether the certificates of deposit are promissory notes, and, being payable at a future day, void, under the 1st and 35th sections of the safety fund act; or whether the assignment in question was made, when the corporation was insolvent, or in contemplation of insolvency; or whether it was made
 
 in the manner
 
 required by law, I am, for the reasons suggested, of the opinion, that this bank had no authority to traffic in stocks, as an article of merchandise, nor to purchase them for the purpose of selling as a means of obtaining money to discharge existing liabilities; that
 
 *347
 
 as the object of the purchase in this case was known to both parties, and made a part of their contract, the debt for the purchase-money cannot be enforced by the vendors; and that the collateral securities must stand or fall with the principal agreement.
 

 The decree appealed from should be reversed, and the bills dismissed, without costs as to the defendants, Pell and wife, and with costs in the court below, as to the receiver.
 

 Pee Cubiam.
 

 The court is of opinion, and does therefore hold:
 

 1. That every association organized under the act to authorize the business of banking, and the acts amending the same, is a moneyed corporation, within the meaning of the statutes of this state relating to moneyed corporations; and is bound and affected by those stat- * 348 1 u*es — excepting only so far as such statutes *are -* inconsistent with the provisions either of the act to authorize the business of banking, or of the acts amending the same.
 

 2. That such associations are banking corporations, and possess only authority to carry on the business of banking in the manner and with the powers specified in the said act. That they have no power to purchase state or other stocks, for the purpose of selling them for profit, or as a means of raising money, except when such stocks have been received in good faith, as security for a loan made by, or a debt due to, such association, or when taken in payment, in whole or in part, of such loan or debt.
 

 3. The decree of the supreme court must, therefore, be reversed, and the bill dismissed, with costs in the courts below, to the receiver, and without costs to the other defendants, but without prejudice to any rights which the state of Ohio may have under the agreement mentioned in the pleadings in the- cause, and the assignment
 
 *348
 
 of the mortgage therein mentioned, except such as said state may seek to enforce as plaintiffs in any suit in the courts of this state, directly founded upon such agreement or assignment.
 

 Decree accordingly.
 

 Buggles, O. J., and Welles, J., dissented.