FARMERS & MECHANICS' BANK vs. RUFUS J. BALDWIN, impleaded, etc.

October 28, 1876.

**Banks of State Cannot buy Promissory Notes.**—Prior to the amendment of Gen. St. c. 33, § 13, banks organized under the provisions of that chapter had no power to purchase or traffic in promissory notes as choses in action, or as a species of personal property.

**Same—Distinction between Purchase and Discount of Notes.**—The power to carry on the business of banking, by discounting bills, notes, and other evidences of debt, is not, within the meaning of that section, a power to buy such securities, but to loan money thereon, with the right to take lawful interest in advance.[1]

[1] In *First National Bank of Rochester* v. *Pierson*, decided September 21, 1877, (to appear in 24 Minn.,) the rule laid down in this case was held to apply to national banks.

Action against the maker and endorser of the following promissory note :

$3,000.                    *St. Paul, Minn., March 16, 1875.*

Three months (without grace) after date I promise to pay to the order of R. J. Baldwin three thousand dollars, at the Farmers and Mechanics' Bank, St. Paul, with interest at twelve' per cent. per annum after maturity until paid. Value received.                              W. S. JUDD.

[Endorsed] R. J. BALDWIN.

In its amended complaint the plaintiff, which is a corporation, organized in 1871 under Gen. St. c. 33, and amendatory acts, after averring the making of the note, alleged "that afterwards, and before the maturity of said note, the said Rufus J. Baldwin, by the name of R. J. Baldwin, for value received, and for an adequate consideration, in the regular course of business, endorsed, in blank, and wrote his name across the back of said note, whereby the same became and was payable to bearer, and delivered said note to said Judd ; that afterwards, and before the maturity of said note, the said Judd, for value received, and for an adequate consideration, in the regular course of business, sold, transferred, and delivered said note to W. C. Patterson ; that afterwards, and before the maturity of said note, in the regular course of business, for value received, and for an adequate consideration, the said W. C. Patterson sold, transferred, and delivered the said note ·to said plaintiff, who thereby became, and now is, the *bona fide* owner thereof."

The defendant Judd made default. The defendant Baldwin, in his amended answer, alleged that he endorsed the note for the accommodation of Judd, and not otherwise ; that the plaintiff paid Judd no consideration therefor, except that it loaned him thereon a sum of money at the rate of 15 per cent. per annum, and upwards, and that the sum so loaned was the face of the note less interest thereon computed for the whole period from date to matur-

ity at the rate of 15 per cent. per annum; that, as a banking corporation, the plaintiff was prohibited by law from taking over 12 per cent. interest on loans or discounts; that the loan and consideration so paid by plaintiff was usurious, and contrary to the statutes of the state, and that the note was void. The defendant further denied that the note was ever sold or transferred by Judd or Baldwin to Patterson, or that Patterson was ever the owner or holder thereof, or had any interest therein, or that he ever sold or transferred the note to the plaintiff; and alleged that plaintiff had no authority under its charter, or under the laws of the state, to purchase the note, but was prohibited by law from so doing, and that the note was wholly void in the hands of the plaintiff.

At the trial in the court of common pleas of Ramsey county, before *Simons*, J., the plaintiff introduced evidence tending to prove the following state of facts: The note in suit, with others of like form, was made by Judd, endorsed by Baldwin, and then delivered by Judd to Patterson, to be used in payment of two notes made by Judd and endorsed by Baldwin, the one for $7,000, belonging to one White, and the other for $6,000, belonging to Patterson, both which last-mentioned notes had been made and negotiated to raise money to pay a debt of Judd to one Gluck. It was agreed between Judd and Patterson (who was a note-broker, and agent for White) that the notes (including that in suit) made to be used in payment of the $6,000 note and the $7,000 note should be disposed of by Patterson at a discount of 15 per cent., Patterson receiving for his services a commission of one-half of 1 per cent. On March 18, 1875, Patterson transferred the note in suit to plaintiff, receiving from plaintiff $2,881.25, being the face of the note less interest thereon from date to maturity at the rate of 15 per cent. per annum. Patterson was not asked to, and did not, endorse the note. The plaintiff knew that Patterson was a broker, and did not require him to

endorse the note because it regarded the paper as perfectly good without the endorsement. The plaintiff had no dealings with Judd or Baldwin about the note before taking it, and there was no evidence that plaintiff, when it took the note, had any knowledge of the circumstances under which it was made and delivered to Patterson.

The defendant introduced evidence tending to prove that Patterson never had any interest in the note in suit, but was merely the agent of Judd to negotiate it.

The court instructed the jury, under exception by plaintiff, that the plaintiff had no power, under its charter, to buy the note in suit, or to become the owner thereof, except by discounting it or loaning money upon it ; that the plaintiff had no power to discount the note, or to loan money upon it, at a rate of interest exceeding 12 per cent. per annum ; and that, if the plaintiff discounted the note at a rate of interest exceeding 12 per cent. per annum, or became the owner of it as a security for a loan made at a rate of interest exceeding 12 per cent. per annum, the verdict must be for defendant. The jury found for defendant, a new trial was refused, and plaintiff appealed.

*Morris Lamprey*, for appellant.

*Bigelow, Flandrau & Clark*, for respondent.

CORNELL, J. It is conceded that plaintiff's only title to the note in question rests upon its absolute purchase, as a chose in action, from one Patterson, the then owner, for a specific sum agreed upon and paid at the time of the purchase. Patterson did not endorse the note, nor expressly assume any obligation in connection with the transfer. Inasmuch as the ownership of the note by plaintiff is put in issue by the pleadings, the question necessarily arises whether the plaintiff had the corporate power to make the purchase in the manner it did, and whether, by such alleged purchase, it acquired any title which it could enforce against either the maker, or Baldwin, the endorser.

The doctrine that a corporation can only exercise such

powers as are expressly granted, or as are incidental to its existence, or necessary to enable it to execute some one or more of its express powers, is too firmly established, both upon principle and authority, to admit of any doubt or discussion. This rule, by which courts must be governed in all enquiries into the existence of any corporate power, is aptly and justly declared to be axiomatic, in the opinion of the court in *First Nat. Bank* v. *Ocean Nat. Bank*, 60 N. Y. 278, 294; *Dartmouth College* v. *Woodward*, 4 Wheaton, 518, 636; 2 Kent, 299; *School District* v. *Thompson*, 5 Minn. 280, 286. So, when an express power is granted, and the specific mode or manner of its exercise is prescribed, it can only be exercised in that particular way. *Bank of Augusta* v. *Earle*, 13 Peters, 519, 587; 2 Kent, 290, 299.

Plaintiff derives its corporate existence and powers from Gen. St. c. 33, as it existed prior to the amendment in 1876, (Laws 1876, c. 92;) and, if it had the power in question at all, it must be found in some of the provisions of that chapter, which relates to banks and banking. Section 2 provides that " any person or association of persons may establish offices of discount, deposit, and circulation, and become incorporated, upon the terms and conditions, and subject to the liabilities, prescribed in this chapter." Section 11 prescribes the manner in which such corporation shall be formed, and declares that upon such its formation as a body politic and corporate, by its assumed name, it shall, by such name, " have power to contract and be contracted with, sue and be sued, and shall have all other powers, privileges, and immunities incident to corporations and applicable to the ends of such establishments, subject, to the restrictions and provisions of this chapter." Section 13, which specifically defines the powers of such corpora-tions, is as follows : " Such person or association has power to carry on the business of banking, by discounting bills, notes, and other evidences of debt, by receiving deposits, by buying and selling gold and silver bullion, foreign coin,

and foreign and inland bills of exchange, by loaning money on real and personal securities, and by exercising such incidental powers as may be necessary to carry on such business."[1]    Section 33 provides that " such bank or banking association may demand and receive, for loans on real and personal security, or for notes, bills, or other evidences of debt discounted, such rate of interest as may be agreed upon by the parties, not exceeding 12 per cent. per annum ; subject, however, to such general laws regulating and fixing the rate of interest as may hereafter be passed by the legislature ; and it shall be lawful to receive the interest in advance, according to the ordinary usage of banking institutions, and in general to do all things, and have all the privileges, incident to banking associations or corporations." Section 43 prescribes a penalty for any violation of the provisions of the chapter.

These sections contain all the provisions of law having any bearing upon the question under consideration.    In construing them, regard must be had to the general nature and purpose of banking institutions, and it must be assumed that the language and terms employed in framing the statute were so used in their then ordinary and appropriate sense—nothing appearing in the enactment itself to show a different meaning.

Bouvier defines a bank to be " an institution authorized to receive deposits of money, to lend money, and to issue promissory notes."    These are its principal attributes. *First Nat. Bank* v. *Ocean Nat. Bank*, 60 N. Y. 278, 288.    Banks are of three kinds, known as banks of discount, deposit, and circulation, though usually, in every American system of banking, all these functions are united in the same institution, as is the case under the present law.    Gen. St. *c.* 33, § 10.    Their chief purpose and design are to furnish safe

---

[1] In this section, as amended by Laws 1869, *c.* 85, the last clause of the above quotation reads: " And by exercising all the usual and incidental powers and privileges belonging or pertaining to such business."

places of deposit for money, to facilitate its payment and exchanges between different persons and places—thereby serving as clearing-houses where located—and to accommodate the business public with loans or discounts to such an extent and on such terms as are compatible with their continued safety and solvency, and the legitimate wants and demands of trade and commerce. McCullough Com. Dict., vol. 1, p. 63 ; Am. Cyc., vol. 2, title *Banks*. In view of these public purposes, in all legislation authorizing their creation it has been usual to designate the character of the securities which they shall be permitted to take upon their loans or discounts, to limit the rate of interest, and to prescribe such other wholesome regulations as experience has suggested to be necessary to subserve the purposes of their creation, and to protect alike the banks and the public from the evils of general insolvency—sure to follow the general absorption and employment of the banking capital of a country in purely speculative enterprises for purposes of private gain alone.

Under the act in question the business of banking is authorized to be carried on "by discounting bills, notes, and other evidences of debt, and by loaning money on real and personal security," (§ 13,) and the rate of interest allowed to be charged for such discounts and loans is limited to 12 per cent., taken in advance. (§ 33.) The obvious intent of this legislation was to secure to the public business-loans and accommodations at what was then regarded reasonable and not exorbitant rates of interest, and also to protect the shareholders of banks, and the banks themselves, against the risk of loss from inadequate securities, such as would likely be taken under the tempting influence of high rates of interest, regulated only by the necessities of borrowers and the cupidity of bank directors. If, however, as is claimed on the part of plaintiff, associations organized under this enactment possess the unlimited power of dealing in promissory notes and other evidences of debt,

as property and choses in action, the same as individuals,. then, obviously, this restriction upon the rate of interest is. a practical nullity, as the bank has the power of evading it. at any time by simply buying the paper instead of loaning money upon it. No judicial construction leading to such a result is allowable, unless required by some clear and unmistakable provision of the statute.

It is not contended, and cannot be, that the power to purchase and traffic in promissory notes, as a species of personal property, belongs to any bank as a necessary incident to its existence, or to the exercise of any of its powers as a bank of circulation and deposit alone. It is not conferred, in express terms, by any provision of the statute. It must exist, therefore, if at all, as an incident necessary to enable it to transact its business as a bank of discount. A bank of discount alone is defined to be " one that furnishes loans upon drafts, promissory notes, bonds, or other securities." Am. Cyc., vol. 2, title *Banks*. " The discounting of notes," says Spencer, J., in *People* v. *Utica Ins. Co.*, 15 John. 358, 392, " is one mode of lending money." In *New York Firemen Ins. Co.* v. *Ely*, 2 Cowen, 678, 699, Sutherland, J., adopts the same definition ; and Gardiner, J., in delivering the opinion of the court in *Talmage* v. *Pell*, 7 N. Y. 328, 343, declares that " to discount bonds, in banking, is only a mode of loaning money." In *Fleckner* v. *Bank of United States*, 8 Wheaton, 338, 350, Story, J., uses the following language : " Nothing can be clearer than that, by the language of the commercial world and the settled practice of banks, a discount by a bank means, *ex vi termini*, a deduction or drawback made upon its advances or loans of money upon negotiable paper, or other evidences of debt, payable at a future day, which are transferred to the bank. We suppose that the legislature used the language in this its appropriate sense." The correct proposition, as we understand it, is concisely stated in the syllabus of the case of *Niagara*

*County Bank* v. *Baker*, 15 Ohio St. 68, as follows: "To discount paper, as understood in the business of banking, is only a mode of loaning money, with the right to take the interest allowed by law in advance."

Discounting a note and buying it are not identical in meaning, the latter expression being used to denote the transaction "when the seller does not endorse the note, and is not accountable for it," (1 Bouv. Law Dict., title *Discount,* citing Pothier De l' Usure, 128,) and it is admitted that such was the character of the transaction in this case. In view of this understanding of the functions of a bank of discount, the legal signification attached to the word "discount," and the distinction between it and the word "purchase," when applied to the business of banking, it is obvious that the power "to carry on the business of banking, by discounting notes, bills, and other evidences of debt," is only an authority to loan money thereon, with the right to deduct the legal rate of interest in advance. This right can be fully enjoyed without the possession of the unrestricted power of buying and dealing in such securities as choses in action and personal property. Though, as is urged by plaintiff, the bank acquires a title to discounted paper, and hence may, in a certain sense, be said to have purchased it, yet it is a purchase by discount—which is permitted—and does not involve the exercise of a power of purchase in any other way than by discount.

It follows from these premises that the powers claimed cannot be regarded as necessarily incidental to that branch of the banking business which pertains to a bank of discount alone. Except as a bank of circulation, the specific powers conferred upon institutions organized under the provisions of this chapter are all enumerated and defined by section 13. Among them is an express grant of power to deal in certain articles of personal property, to wit, "buying and selling gold and silver bullion, foreign coin, and foreign and inland bills of exchange." Promissory notes,

however, are not included. Clearly, as is suggested by Gardiner, J., in *Talmage* v. *Pell*, 7 N. Y. 328, the maxim *expressio unius*, etc., is applicable here. If an express grant ·of power was deemed necessary to enable a bank created under this statute to deal in " gold and silver bullion, coin, and bills of exchange," and to invest its funds therein, it is difficult to see why it was not also given as to promissory notes; if it was intended that the bank might ever exercise ·any such power in respect to them.

In the itemized statement of assets and liabilities, which ·each bank is required to make quarterly, by section 34 of the statute, it is made the duty of the bank to report, among other things, the aggregate amount of its loans and dis-·counts, and also, separately, its "promissory notes." No inference can be drawn from this that the notes here referred to are any other than those lawfully acquired by the bank, through the exercise of its conceded powers, in making loans on personal securities and in discounting commercial paper. In both these ways promissory notes may be lawfully obtained and held, and, if knowledge of the amount of such kind of paper was deemed important for any purpose, the provision in question was not only pertinent, but absolutely necessary; for it is apparent that a mere statement of the total amount of its loans and discounts would not disclose the desired information. The obvious purpose of the section was, not to define the powers of these institutions, or the manner in which they might be exercised, but to procure a true and correct statement of their condition, at stated periods, for the use and benefit of the public; and, hence, no power can be implied from any of its provisions, unless the implication is rendered necessary and unavoidable, both from the language and the context. All the provisions of this chapter of our laws having any bearing upon the question under consideration are essentially the same as those contained in the New York statute upon the same subject, from which ours seems to have been copied.

Section 13 of our statute, in particular, which relates to the powers of these associations, is identical in substance, and nearly in language, with a similar section in the New York statute. In the case of *Talmage* v. *Pell*, 7 N. Y. 328, the question arose whether a bank organized under that statute had any legal capacity to purchase the negotiable bonds of the state of Ohio, for purposes of gain or profit. After full and exhaustive argument, the court of appeals decided, in an opinion covering the whole ground, that it had no such power.

In the case of *Niagara County Bank* v. *Baker*, decided by the supreme court of the state of Ohio, (15 Ohio St. 68,) the same statute came under review, upon a state of facts presenting the precise point involved in this case, and it was held that a power to carry on the business of banking, by discounting promissory notes, was not a power to purchase such notes, but to loan money thereon. Recognizing the principle of these decisions as correct, it must be regarded as decisive of the present case.

Having no corporate capacity to make the contract of purchase, the plaintiff never acquired any title to the note in suit, and the attempted act of purchase was strictly *ultra vires*, and conferred no rights whatever. *Wiley* v. *First Nat. Bank of Brattleboro*, 14 Am. Law Reg. (N. S.) 342; *Matthews* v. *Skinker*, 15 Id. 488; *Kansas Valley Nat. Bank* v. *Rowell*, 2 Dillon, 371; *Hoffman* v. *John Hancock Mut. Life Ins. Co.*, 92 U. S. 161.

Upon this ground the order denying a new trial is affirmed.

GILFILLAN, C. J., *dissenting*. I am of opinion that, while it may not have been the intention of the statute that banks organized under it shall engage in the business of trading in promissory notes, yet such a bank may, as incidental to its business of banking, invest its surplus funds in the purchase of promissory notes, stocks, and similar securities, not for the purpose of trading in them—of buying and

selling them—but of investing its unemployed funds in them. Section 34 of the statute seems to contemplate that banks may hold such securities, obtained by purchase, for it requires that the quarterly statements to be made by the bank shall state, not only loans and discounts—which would cover notes obtained by loans or discount—but, also, " stock and promissory notes." And as it is not to be presumed as against a corporation, any more than against a private person, that it has violated the law, ( *Chautauque County Bank* v. *Risley,* 19 N. Y. 369, 381 ; *Farmers' Loan and Trust Co.* v. *Clowes,* 3 N. Y. 470 ; *Safford* v. *Wyckoff,* 4 Hill, 442,) this plaintiff must be presumed to have acquired this note in a lawful manner until the contrary is shown—that is, it must be presumd that the plaintiff purchased the note for the purpose of investing its unemployed funds, and not for the purpose of selling again.

I think there should be a new trial.