## EDWARD PAPE V. CAPITOL BANK OF TOPEKA.

1. BANKS; *Constitution Construed.* Article 13 of the state constitution, entitled "Banks and Currency," applies to banks of issue, and does not prohibit the legislature from creating banks of deposit and discount.

2. CORPORATIONS, *De Facto, and De Jure; Public Policy.* Where there is a general law under which an incorporation can be had, an incorporation attempted in good faith to be made thereunder by the requisite number of corporators, and where in reliance upon such supposed perfect compliance with the statute in all the steps prescribed for the organization, there is an actual, open, and notorious exercise for a series of years, unchallenged by the state, of the powers of a corporation, public policy will not permit one who has frequently dealt with it as a corporation, when sued upon a note purchased and held by such supposed corporation, and which as a corporation it might rightfully purchase and hold, to defeat the action by showing a technical omission in some of the proceedings prescribed for the organization of corporations. The corporation is as to him one *de facto;* and whether it be one also *de jure,* is a question not open for inquiry in that collateral manner.

   *Quære:* Was not section 130 of the corporation law intended as a substitute for section 6 of said act, so far as the incorporation of savings associations is concerned ?

3. MISNOMER, *of Corporation; Amendment.* A petition was filed in the name of "The Capitol Bank of Topeka." The certificate of incorporation offered in evidence showed that the name selected for the association was "The Capitol Bank," and that its prescribed place of business was Topeka. *Held,* That the variance was too slight to be regarded as a defense to the action, and any needed amendment will be considered as made.

4. SAVINGS BANKS, OR ASSOCIATIONS; *Discounts; Purchases.* Under the general power of discounting negotiable notes, granted by section 127 of the corporation law to savings associations, such institutions have the power to purchase such notes.

### *Error from Shawnee District Court.*

FORECLOSURE of mortgage, brought in the name of *The Capitol Bank of Topeka,* against *Pape* and wife, mortgagors. The defenses interposed are fully stated in the subjoined opinion. The district court, at December Term 1875, gave judgment in favor of plaintiff, and defendants bring the case here on error.

W. P. *Douthitt*, and J. D. *McFarland*, for plaintiffs in error.

N. C. *McFarland*, and J. G. *Slonecker*, for defendant in error.

The opinion of the court was delivered by

BREWER, J.: This was an action brought by "The Capitol Bank of Topeka," to recover a personal judgment against Pape and wife, on three promissory notes made by them, and to foreclose a mortgage on lands in Shawnee county, given by them to secure the payment of said notes. The notes are made payable to "James M. Spencer, or bearer," and have written across the back, "Pay to bearer, without recourse on me: James M. Spencer." The mortgage was made to Spencer, and has indorsed thereon an assignment to "The Capitol Bank of Topeka." The notes and mortgage were made at Topeka on 27th June 1872, and are alleged to have been transferred to the defendant in error on 13th March 1873. The petition also alleges that said bank is a body corporate, duly incorporated under and by virtue of the laws of the state of Kansas, as "The Capitol Bank of Topeka." The defendants answered separately, each interposing several defenses, only two of which are relied on, and they may be briefly stated as follows: First, a denial that plaintiff was or ever had been a body corporate under the laws of the state of Kansas as "The Capitol Bank of Topeka," (which denial was verified by the affidavits of the defendants;) second, defendants admitted the making of the notes and mortgage sued on, but alleged that the plaintiff purchased the same of said Spencer at a price agreed upon and for speculative purposes, and did not acquire or hold said notes or mortgage, or either of them, by reason of having made a loan of money on them, or either of them, or for any of the purposes for which it could legally acquire or hold the same or either of them.

In support of the first defense, it is claimed, first, that the law under which the bank, defendant in error, was organized

29—20 KAS.

was unconstitutional; second, that in its attempted organization it did not comply with the statutes respecting the organization of corporations; and third, that there is a fatal variance between the name, as alleged, and that proved. Of these in their order:

I. As to the unconstitutionality of the law. The plaintiff was organized under article 16 of chapter 23, Gen Stat., which is entitled "Savings Banks," and which provides for the organization of "Savings Associations." It is claimed that this has no validity because of section 8 of article 13 of the constitution, which provides that—

"No banking law shall be in force until the same shall have been submitted to a vote of the electors of the state at some general election, and approved by a majority of all the votes cast at such election."

No banking law, it is conceded, has ever been submitted to a proper vote. So that the question is fairly presented, whether the organization of savings banks is prohibited by the constitution until sanctioned by a proper vote. Article 13 of the constitution is entitled, "Banks and Currency." An examination of the article indicates that it refers exclusively to banks of circulation. The first section simply requires a general banking law. The second and third provide the security for circulating notes. The fourth, what such notes shall be redeemable in. The fifth, that the state shall not be a stockholder. While the sixth and seventh still more clearly indicate the scope and purpose of the article, as follows:

"SEC. 6. All banks shall be required to keep offices and officers for the issue and redemption of their circulation, at a convenient place within the state, to be named on the circulating notes issued by such bank.

"SEC. 7. No banking institution shall issue circulating notes of a denomination less than five dollars." [This section was amended in the first year of our state history by changing "five" to "one."]

Section 8 we have quoted above; and section 9 is simply concerning amendments and repeals.

These are all the sections in the article; and they manifestly indicate the scope of the article to be only concerning banks of circulation, and the purpose to preserve control over any currency issued in the state. Unquestionably there are the three kinds of banks defined by Bouvier — banks of deposit, banks of discount, and banks of circulation; and the language of the first section of said article 13 is general: "No bank shall be established otherwise than under a general banking law." So that, under a technical construction of sections one and eight, and ignoring the other sections, the establishment of any bank, of any kind, and for any purpose, would be forbidden. And as the article does not name incorporated, as distinguished from unincorporated banks, and as constitutional provisions have respect to the substance, and not merely to the form, or name, the carrying on of any banking business by any corporation, institution, or person, whether of issuing currency, receiving deposits, or discounting commercial paper, would fall within the prohibitions of this article. Clearly no such check upon the commercial interests of the state was intended. "Banks and Currency," is the title; and *currency banks* are those and those only intended by the article. All banks, that is, all banks within the scope of the article, are required to keep offices and officers for the issue and redemption of their circulation. But a bank of deposit purely, has no circulation. It is not a bank, therefore, within the scope of the article.

This conclusion is made more clear by an examination of the debates of the constitutional convention. One of the first articles discussed by the convention was this 13th article, on banks and currency; and during the entire discussion banks of deposit and discount were not even mentioned. The whole purpose of the article, as indicated by the opinions expressed, was the regulation of the currency. The illustrations from other states were simply of banks of issue; the only suggestions and amendments made or offered were explained as touching only the question of currency. If in the mind of any member of that convention was an opinion

that by this article the legislature was to be precluded from organizing institutions for the safe-keeping or loaning of money, no intimation thereof fell from his lips during the discussion. Such silence has but one reasonable explanation, and that is, that banks of issue were alone intended to be included within the scope of the article.

II. The existence of the corporation was put in issue by the pleadings, and to establish its existence the defendant in error proved the following facts: That the stockholders met and elected directors; that the directors met and elected a president, vice-president, secretary, cashier, and teller; that the president and secretary made the certificate required by section 130, in article 16 of chapter 23 of the General Statutes, and had the same properly acknowledged, filed, and recorded; that it procured a room, and commenced business as a bank, and from September 1871, till 1875, carried on the general banking business in Topeka, Kansas; that prior to the commencement of business, the stock was all taken, and twenty-five per cent. paid in; that Edward Pape did some banking business with it prior to March 1873, but such business transactions were concerning matters wholly unconnected with the notes and mortgage in suit; and that he also paid to the bank one of the notes secured by this mortgage, and some small portion of another. This was properly held sufficient. It would seem probable that, as to savings institutions, said section 130 was intended as in lieu of and a full substitute for section 6 of the same chapter. Section 5 names some thirty-five purposes for which private corporations may be formed; but "savings associations" are not named among these. Section 6 provides the manner of organization, and would seem naturally to refer to such corporations as by the prior section were authorized to be organized. While article 16 refers to "savings banks" alone, authorizes their creation, provides for their organization, and seems to be complete in itself. There is a marked similarity between section 130 and section 6 in the matters required to be stated; and it would seem strange if a double statement was required in the or-

ganization of savings banks, and only one in case of other corporations. There are doubtless some objections to this construction, which however it is unnecessary to notice. For when parties have associated themselves together for the purpose of organizing a corporation under a general law, and have proceeded in good faith to take all the steps supposed necessary to complete such incorporation, and on the faith thereof engaged in business as a corporation for a series of years, a party who has repeatedly dealt with them as such corporation will not, when sued on a note and mortgage held by it, be permitted to show, as a defense to the action, that there was some mere technical omission in the steps prescribed for incorporation. The corporation is one *de facto;* and only the state can then inquire, and that in a direct proceeding, whether it be one *de jure.* The authorities upon questions of this kind are mainly in cases where the incorporation was by special charter. There, the charter, with proof of acts of user under the charter, has almost uniformly been held sufficient as against any collateral inquiry. (Angell & Ames on Corp., §§ 91 to 94, and § 635, and cases cited in notes.) And we suppose the same principle obtains in incorporations organized under a general law. There must in such cases be a law under which the incorporation can be had. There must also be an attempt in good faith on the part of the corporators to incorporate under such law. And when, after this, there has been for a series of years an actual, open, and notorious exercise, unchallenged by the state, of the powers of a corporation, one who is sued on a note held by such corporation will not be permitted to question the validity of the incorporation as a defense to the action. No mere matters of technical omission in the incorporation, no acts of forfeiture from misuser after the incorporation, are subjects of inquiry in such an action. This is not upon the ground of equitable estoppel, but upon grounds of public policy. If the state, which alone can grant the authority to incorporate, remains silent during an open and notorious assertion and exercise of corporate powers, an individual will not, unless there be

some powerful equity on his side, be permitted to raise the inquiry. The law holds out no such encouragement to attempt to avoid the payment of contract debts. This decision in no way conflicts with that in the case of *Krutz v. Paola Town Company*, just decided, (ante, p. 397,) for in that the charter limit of existence had passed, and the law been repealed, so that the only thing to be invoked against the plea of *nul tiel* corporation, was the doctrine of equitable estoppel. And there was no equity against the defendant, but all on his side.

III. We see no substantial merit in the claim of misnomer. The variance was one, not at all misleading, and which called simply for an amendment of the pleading. The petition was in the name of "The Capitol Bank of Topeka." The act of incorporation names the institution "The Capitol Bank," and gives Topeka as its place of business. If any amendment were necessary it will be considered as made by this court. *Mo. Valley Rld. Co. v. Caldwell*, 8 Kas. 244.

IV. The final question is as to the power of the plaintiff to acquire and hold the note and mortgage. The note and mortgage were made to Spencer. From him, as the owner and holder, the bank purchased. Was such a purchase beyond its power? Sec. 127 of art. 16 of the general incorporation law, (Gen. Stat. 225,) specifically defines the powers of such associations, and is as follows:

"Any five or more persons in any county in this state may organize themselves into a savings association, and shall be permitted to carry on the business of receiving money on deposit, and to allow interest thereon, giving to the person depositing, credit therefor; and of buying and selling exchange, gold, silver, coin, bullion, uncurrent money, bonds of the United States, of the state of Kansas, and of the city, county, and school district in which any association shall be organized; of loaning money on real estate, and personal security, at a rate of interest not to exceed twelve per cent. per annum; and of discounting negotiable notes, and notes not negotiable; and on all loans made may keep and receive the interest in advance."

Now the contention is, that the clause under which alone

authority for this purchase can be claimed is that which authorizes "discounting negotiable notes, and notes not negotiable;" and that this was not a discount, but a purchase. Counsel for plaintiffs in error, say:

"Whatever loose or general meaning may have been given to the term *discount*, when not applied to banking business, no proposition is more firmly established by judicial decisions than this, that discounting paper, as understood in the business of banking, is only a mode of loaning money on the same and taking the interest in advance. *Niagara Co. Bank v. Baker*, 15 Ohio St. 69; *Talmage v. Pell*, 3 Seld. 343; *Fleckner v. Bank of United States*, 8 Wheat. 338; *People v. Utica Ins. Co.* 15 Johns. 391; *Fireman's Ins. Co. v. Ely*, 2 Cow. 699; *Philadelphia Loan Co. v. Towner*, 13 Conn. 259; *McLean v. Lafayette Bank*, 3 McLean, 597; *Dunkle v. Rennick*, 6 Ohio St. 634; *Farmers' and Mechanics' Bank v. Baldwin*, 23 Minn. 198; 14 Alb. Law Jour. 391, (Dec. 9, 1876;) *Fowler v. Scully*, 72 Penn. St. 456. It necessarily follows from the reasoning of these cases, that there is a difference between *discounting* a note, and *buying* it. For authority directly on this point, see Morse on Banks and Banking, 20, and 1 Bouv. Law Dic. 481, title, *Discount*, citing Pothier, *De l' Usure*, n. 128, where it is said the latter expression is used to denote the transaction 'when the seller does not indorse the note, and is not accountable for it.'"

An examination of some of the authorities chiefly relied on by defendant, may be of value. In *Fowler v. Scully*, 72 Penn. St. 456, the question was, as to the power of a national bank to take a mortgage to secure notes to be thereafter discounted; and by a divided court the mortgage was held void. There is nothing in the question or opinion which throws any special light on the question before us.

In the case of *Talmage v. Pell*, 7 N. Y. 328, it was decided that a banking corporation, empowered "to carry on the business of banking by discounting bills and other evidences of debt," was not thereby authorized to traffic in state stocks, and that a purchase of such stocks, with a view of sale, was beyond its powers.

In *Niagara Co. Bank v. Baker*, 15 Ohio St. 68, the plaintiff, a bank of the state of New York, sued the defendants as

indorsers of certain promissory notes. The answer alleged a loan from the bank to them, and a discount of these notes at usurious rates. The reply denied any loan, and alleged that it discounted the notes in the usual course of business. Counsel for defendant laid down two propositions in their brief— 1st, that if the transaction was a loan, it was void for usury; and 2d, if a purchase, void for want of power in the bank to make it. The court in its opinion, after giving the general meaning of the word *discount*, as we quote hereafter, proceed: "And this brings us to the precise question upon which the decision of this case depends. Was this bank empowered to discount, *by way of purchase*, promissory notes? or, must all such discounts be deemed loans, and thus be brought within the purview of the usury law?" And they conclude in favor of the latter alternative, saying, "But the naked power to discount paper is not given; it is the *power to carry on the business of banking by* (among other things) *discounting bills, notes, and other evidences of debt.*" And then inquiring what "discounted paper" means, as used in the business of banking, hold, that it refers simply to loans, referring with especial stress to the case of *Talmage v. Pell*, supra, as an authoritative exposition of the New York statute under which plaintiff was organized.

In the case of *Farmers' & M. Bank v. Baldwin*, 23 Minn. 198, the language of the statute appears similar to that referred to in 15 Ohio St., *supra*. The bank was given "power to carry on the business of banking by discounting bills, notes," etc.; and a majority of the court held, that that was not a power to purchase such securities, but simply to loan thereon, with the right to take lawful interest in advance.

In *Fleckner v. Bank*, 8 Wheat. 338, it appeared that the plaintiff purchased from another bank a note which had passed to it through several parties from the original holder. The bank was forbidden to deal in anything except bills of exchange, gold, or silver, or take more than six per cent. upon its loans or discounts. It was claimed that the purchase of this note was *ultra vires*; but the court held otherwise, hold-

ing that such purchase was but a discount. In the opinion, Story, J., speaking for the court, says: "But in what manner is the bank to loan? What is it to discount? Has it not a right to take an evidence of the debt, which arises from the loan? If it is to discount, must there not be some *chose in action*, or written evidence of a debt, payable at a future time, which is to be the subject of the discount? Nothing can be clearer than that by the language of the commercial world, and the settled practice of banks, a 'discount' by a bank means, *ex vi termini*, a deduction or drawback made upon its advances or loans of money, upon negotiable paper, or other evidences of debt, payable at a future day, which are transferred to the bank."

We may also at this time properly notice a late case cited by the plaintiff, that of *Smith v. Exchange Bank*, 26 Ohio St. 141. In that case the defense made was, that the bank (a national bank) *purchased* the paper of the payees, and that it had no authority to make such purchase. Upon this the court uses this language: " It does not state that the purchase was made at a usurious rate of discount; but it avers that under the act of congress to provide a national currency, under which the bank was incorporated, it had no authority to *purchase* the bill. It seems to be the idea of counsel making the objection, that negotiable paper, perfect, and available in the hands of the holder, is not the subject of purchase by a national bank at any rate of discount. This view, we think entirely erroneous. We see nothing in the act of congress, nor in reason, why a borrower may not obtain the discount by a bank of the existing notes and bills of others of which he is the holder, as well as of his own paper, made directly to the bank. It is true, that, as between natural persons, the purchase of such paper when made in good faith, and not as a disguise for a loan, is not subject to the usury laws; but it is otherwise as to a bank. In the business of banking, the purchasing and discounting of paper is only 'a mode of loaning money.'" And further on, in reference to any question of usury, the court holds that it arises be-

tween the bank and its customer, and not between it and the original parties to the paper.

These authorities go no further than this: that where an ordinary commercial bank is created, and power given it, not generally to discount, but specially to carry on the business of "banking by discounting," its power is limited to that of loaning money on paper, and on such loans subjects itself to the operations of the usury laws. It may not purchase, as an individual may, paper already existing at any price it may agree upon with the holder, but can only deduct from its face the legal interest in advance. We express no opinion upon these authorities, or the propositions they assert. But we draw two clear distinctions between them and the case at bar: And first, the plaintiff is not an ordinary commercial bank. At least, whatever may have been the practical workings of this bank, the intention of the legislature in the statute was, a "savings bank." That is the title of the article. The grant is of authority to organize a savings association. The first power is to receive money on deposit, and allow interest thereon; and that is the main purpose of a savings bank. It is true, among the further powers are those of discount, and dealing in bullion and bonds; but it is needful that some powers be granted of so using the deposits, and other funds, as will secure their safety, and enable the corporators to pay the interest on the deposits, and at the same time receive adequate compensation for their labor and the use of their capital. Just as power is given to an insurance corporation to invest its funds in such manner as will be profitable. And in interpreting the powers possessed by a corporation, we must not make the interpretation depend on the manner in which the corporation actually exercises its powers, but upon the intention of the legislature in the enactment of the statute. The intention was, "savings bank." The corporation may in fact have been a purely commercial bank. If it has misused its powers, the state alone may inquire. The extent of the powers granted, is to be determined by the character of the institution intended by the

legislature. It is said by the court, in the case from 23 Minn., *supra*, in support of the construction placed upon the powers granted by the statute: "The obvious intent of this legislation was to secure to the public business loans and accommodations at what was then regarded reasonable and not exorbitant rates of interest, and also to protect the shareholders of banks, and the banks themselves, against the risk of loss from inadequate securities, such as would likely be taken under the tempting influence of high rates of interest, regulated only by the necessities of borrowers, and the cupidity of bank directors." But the primary purpose of a savings bank is not to facilitate commercial transactions by securing to the public business loans and accommodations, but to furnish a safe place of deposit for funds. The other powers are subordinate to this.

Again, the power granted is the naked power of discounting, and not the power of carrying on the business of banking by discounting. And the term "discounting," includes purchase, as well as loan. "To discount, signifies, the act of buying a bill of exchange, or promissory note, for a less sum than that which upon its face is payable." (1 Bouv. Law Dic., title, *Discount.*) "It is. also undeniably clear, that the term *discount*, when used in a general sense, is equally applicable to either business or accommodation paper, and is appropriately applied, either to *loans* or *sales* by way of discount, when a sum is *counted off*, or taken from the face or amount of the paper, at the time the money is advanced upon it, whether that sum is taken for interest upon a loan, or as the price agreed upon a sale." *Niagara Co. Bank v. Baker*, 15 Ohio St. 85. See also, case from 8 Wheaton, *supra*.

We conclude therefore,.that the purchase of the note and mortgage in question was within the powers granted to this savings bank.

This disposes of the case, and compels an affirmance of the judgment.

All the Justices concurring.