COUNTY OF DIVIDE, a Municipal Corporation, Respondent, v. L. R. BAIRD, as Receiver of the First State Bank of Wild Rose, (Substituted for Said Bank as a Defendant), Appellant. C. A. CHRISTIANSON, C. O. Trytten, H. J. Newhouse, and Andrew Urseth, Respondents.

(51 A.L.R. 296, 212 N. W. 236.)

**Banks and banking — banking business controlled by legislature.**

1. The business of banking is affected with a public interest and the legislature may prohibit it altogether, or may prescribe the conditions under which it may be conducted.

**Banks and banking — bank has express and incidental powers.**

2. A bank has such powers as are expressly given it; these are express powers. In addition, it may exercise certain powers which are incidental to those expressly given; but the *incidental* powers are such only as are necessary to carry on the business of banking, that is, such as are incidental to the powers expressly enumerated.

**Banks and banking — banking corporation created for more special purpose than ordinary corporation — is wholly creature of statute.**

3. A banking corporation is created for a more limited and special purpose than is a corporation organized under the general statutory charter, for the purpose of conducting ordinary business; it is the grantee of the exclusive privilege to do a specified business in a manner circumscribed by definite restrictions. It is wholly the creature of statute; and it does business by legislative grace.

Annotation.— (1) On the question of right of individuals to engage in banking business and regulation thereof, see annotation in 5 L.R.A.(N.S.) 874; 3 R. C. L. 379, 380; 1 R. C. L. Supp. 816; 5 R. C. L. Supp. 170; 6 R. C. L. Supp. 175.

(2) On powers and functions of banks generally, see 3 R. C. L. 419; 1 R. C. L. Supp. 822; 5 R. C. L. Supp. 172.

(4) On power of bank to pledge assets to secure deposits' see annotation in 45 L.R.A.(N.S.) 950; 51 A.L.R. 296; 3 R. C. L. 419; 1 R. C. L. Supp. 822.

(7) Relation created between bank and depositor by deposit of public funds, see 22 R. C. L. 224.

(9) Legislative authority and control over counties, see 7 R. C. L. 926; 2 R. C. L. Supp. 475.

(10) On right to preference in respect to public fund in bank which subsequently becomes insolvent, see annotation in 5 L.R.A.(N.S.) 886; 16 L.R.A.(N.S.) 918; L.R.A.1917A, 683; 3 R. C. L. 644; 1 R. C. L. Supp. 872; 5 R. C. L. Supp. 193; 6 R. C. L. Supp. 193.

**Banks and banking — pledging assets to secure deposits not incidental power of bank.**

4. The pledging of assets to secure a general deposit cannot be sustained as the exercise of an incidental power, necessary to carry on the business of banking. An attempt to pledge goes beyond the charter powers of the corporation and is not an incident to the privilege to receive general deposits.

**Banks and banking — power of bank to receive deposits of public funds is express, not incidental or implied.**

5. The legislature has prescribed the mode in which a bank may receive and a public corporation make a deposit of public funds. That mode is by a personal or surety bond as security. This statute is a part of the corporate charter, insofar as it relates to the exercise of power by a bank. The power is express, not incidental or implied; and when a legislative enactment prescribes one mode of exercising an express power or privilege, it implies an inhibition to exercise the given power in any other way.

**Depositaries — pledge of bank's bills receivable to secure deposit not part of contract of deposit nor part consideration therefor.**

6. When a pledge of a bank's bills receivable is wholly gratuitous, one which the public board could not require or the bank make, even had the latter been authorized by the directors, such pledge is no part of the contract of deposit; nor is it in any legal sense a part of the consideration therefor.

**Banks and banking — loans of public funds to banks is prohibited by law — deposits thereof sanctioned by law.**

7. The legislature has at all times since statehood recognized a distinction between a loan and a deposit of money; and in the case of the funds of public corporations loans have been prohibited while deposits thereof have been sanctioned by law. From the fact that a bank may secure a loan, by pledging its bills receivable, the inference is not warranted that the legislature intended to give banks the power to pledge their assets to secure either a public or a private deposit.

**Banks and banking — creditors and depositors of insolvent bank are not estopped, under lawful contract to assert want of bank's power to pledge assets to secure public deposit.**

8. The general creditors of a bank are innocent parties and have equities which are superior to those of a county seeking to enforce a pledge of assets to secure a public deposit when the defense of ultra vires is interposed against the public corporation. As between the creditors and depositors of an insolvent bank, whose contractual relation with the corporation was created lawfully—intra vires—and the plaintiff, whose contract of pledge was ultra vires of the bank, the former must be preferred, and they are not estopped to assert the want of power.

Counties — counties may do business only in manner prescribed by constitutional law — may not contract with bank to secure public deposit by pledge of bank's bills receivable.

9. A county is a political subdivision of the state; and it may speak and act only in the manner and in the matters prescribed by the legislature in statutes enacted pursuant to constitutional authority. A county has not the legal capacity to enter into an engagement which will, in effect, create a class of preferred depositors in banks, contrary to the policy of express law and the deliberate purpose of the legislative assembly.

Banks and banking — bank may not secure public deposits by pledge of assets — depositor of public funds not preferred creditor in case of insolvency of bank.

10. Chapter 199, Sess. Laws 1923, the depository law, and other legislation evidences the policy of this state with respect to the deposit of public funds and the manner in which such deposits must be secured; and it is contrary to that legislative policy for a bank to secure this class of deposits by a pledge of its general assets. It was not intended that the public should occupy the position of a preferred creditor, to the detriment of private depositors, in the event of the insolvency of the depository, or that such a result could be brought about by secret agreement between the parties.

Banks and banking — attempt of bank to secure deposit of public funds by pledge of assets is unlawful and against public policy.

11. For reasons stated in the opinion, it is held that the attempted agreement of pledge was contrary to the policy of express law, and consequently unlawful, within § 5922, Comp. Laws 1913; and that the privilege to receive deposits of public funds was exercised in a manner contrary to the public policy of this state. The pledge agreement is unlawful, not merely in the sense that in making it the bank and the county exceeded their charter or statutory powers, but also in the sense that it is against public policy.

Contracts — equity will not give any relief under contract impliedly forbidden and also contrary to public policy.

12. When the contract which a court of equity is asked to enforce is not only impliedly forbidden, but is also contrary to a well defined legislative policy, the court will refuse to give any relief thereunder.

Opinion filed November 15, 1926.  Rehearing denied February 14, 1927.

Banks and Banking, 7 C. J. § 6 p. 478 n. 36; § 10 p. 480 n. 55, 56, 57; § 213 p. 586 n. 92, 93; § 231 p. 592 n. 68 New; § 232 p. 592 n. 70; § 240 p. 596 n. 22 New; § 502 p. 736 n. 71; § 543 p. 749 n. 58, 59 New.  Contracts, 13 C. J. § 351 p. 420 n. 77; p. 421 n. 79; § 366 p. 429 n. 53; § 440 p. 493 n. 18.  Corporations, 14a C. J. § 2157 p. 308 n. 76; p. 309 n. 85.  Counties, 15 C. J. § 1 p. 388 n. 5; § 51 p. 419

n. 98; § 53 p. 420 n. 9. Depositaries, 18 C. J. § 46 p. 581 n. 45; § 54 p. 585 n. 34, 39; § 55 p. 585 n. 41. Receivers, 34 Cyc. p. 239 n. 80. Statutes, 36 Cyc. p. 1113 n. 84 New; p. 1122 n. 49.

Appeal from District Court of Divide County, *Moellring, J.*

Reversed, in part; and modified.

*Divet, Holt, Frame & Thorpe,* for appellant, Baird, as receiver; *Pierce, Tenneson, Cupler & Stambaugh* and *Conmy, Young & Burnett,* as amici curiæ.

"These statutes were intended primarily for the protection of depositors. Experience has demonstrated the necessity of such regulatory measures. If a bank may employ all of its assets in the purchase of real estate, and does so, it will hardly be in position to meet its obligations to its depositors." Smith v. Rennix, 52 N. D: 938, 204 N. W. 843.

"The unexpressed and incidental powers of a corporation are not limited to such as are indispensably necessary to the exercise of the powers specifically granted. Whatever incidental powers are reasonably necessary to its corporate functions being implied from the powers affirmatively granted, but powers merely convenient or useful are not implied if not essential in view of the nature and object of the incorporation." Gause v. Commonwealth Trust Co. 89 N. E. 476.

"A banking corporation comes severely within the rule that all acts not authorized by its charter and the law under which it was incorporated, are ultra vires. The very nature of its business requires a strict enforcement of the law, that its stockholders may become liable and that the earnings and savings of depositors may be safely preserved." Magee, Banks & Bkg. 2d ed. p. 21.

*Olaf Braalelien,* State's Attorney and *H. W. Braatelien,* Assistant State's Attorney and as amicus curiæ, for plaintiff and respondent; *George P. Homnes,* for defendants and respondents.

"More properly speaking, ultra vires contracts of a corporation are such as do not in any manner serve the accomplishment of the purposes for which the corporation is chartered. They are contracts not positively forbidden, but impliedly forbidden, because not expressly or impliedly authorized." Tourtelot v. Whithed, 9 N. D. 479.

JOHNSON, J. Plaintiff brings this action to recover the amount of

a deposit of county funds in the First State Bank of Wild Rose, and to foreclose a contemporaneous pledge of certain certificates of indebtedness. Judgment was entered in favor of the plaintiff against the defendant Baird, who, as receiver of the First State Bank of Wild Rose, prosecutes this appeal.

In July, 1923, acting under chapter 199, Sess. Laws 1923, the plaintiff proceeded to designate a depository of its funds; the First State Bank of Wild Rose made a bid for the deposit and the board of county commissioners passed a resolution designating this bank as a depository. The bank furnished a bond in the usual form, signed by the receiver's codefendants as sureties, dated October 15, 1923. The bond was approved by the county board. About the time the bond was approved and when the county was ready to make the deposit, some negotiations were had, not appearing in the record of the proceedings of the county commissioners, which resulted in the pledging of certain certificates of indebtedness of municipalities within Divide county as collateral security for the deposit. The complaint alleges that the pledge was made October 18, 1923, the date of the deposit, as "collateral security to the bond." The reason for the negotiations which culminated in the pledging of the securities appears to have been that the board had approved and acepted a personal and not a surety bond. Under the statute, either bond may be sufficient.

The court found that on October 18, 1923, the county deposited in the First State Bank of Wild Rose, $6,500 for which a certificate of deposit was issued and delivered to the plaintiff. It is this certificate which is the basis of the plaintiff's claim.

Some time after the deposit was made, the bank became insolvent and appellant Baird, as receiver, in due time took charge of its affairs. Demand was made for repayment of the deposit and, upon failure to comply, proceedings were commenced to recover the same and to foreclose the pledge. The trial court entered a judgment in favor of the plaintiff which established a valid and subsisting money demand against all the defendants, adjudged the pledge to be valid, and directed that the hypothecated securities be sold and the proceeds applied in satisfaction of the judgment against the bank *and the sureties.* The trial court concluded, as a matter of law, that inasmuch as the defendant bank and its sureties had neither complied with the demand to re-

turn the money deposited nor tendered a return thereof, the receiver and the sureties were estopped from questioning the regularity of the pledge.

The question in this case is stated in the following language by counsel for the appellant: "The court erred in holding that it was within the power of the defendant bank to secure the county deposits by a pledge of the assets of the bank as additional security to the statutory bond, and in not holding that the attempted pledge of assets was ultra vires and void as against the creditors of the bank, represented by the appellant receiver." In its narrowest terms, the controversy resolves itself into a question whether a state bank has the charter power to pledge its assets as a security for a deposit of the funds of a public corporation. As the case has been tried and submitted by both sides, the broader question of the power of a state bank to pledge its assets in order to secure a general deposit, whether from an individual or a public corporation, is presented. It is contended by the appellant that no such power exists and that a contrary conclusion results in the creation of preferences and of establishing classes among depositors wholly beyond the charter powers of state banks.

The county answers by insisting, first, that the defendants, including the receiver, are estopped because of their own conduct, the contract having been fully performed and no tender of a return of the money having been made, from questioning the validity or regularity of the deposit and the pledge; and, second, that if the defendants be not estopped, there is, in fact, and was, when the transaction in suit took place, a power in state banks to pledge their general assets as security for deposits.

In any discussion of the question of power of a banking corporation, it is important to bear in mind that the business of banking is so intimately connected with the public interest that the legislature may prohibit it altogether, or may prescribe the conditions under which it may be done. State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 11 L.R.A. 420, 46 N. W. 970. The position of such a corporation is largely fiduciary. Gause v. Commonwealth Trust Co. 196 N. Y. 134, 24 L.R.A.(N.S.) 967, 89 N. E. 476; and see American Exp. Co. v. Citizens State Bank, 181 Wis. 172, 194 N. W. 427. The legislature has withheld the privilege from natural persons, and from all but a

designated class of corporations. It would seem to follow that the corporation must do business in the manner defined. "All acts not authorized by its charter and the law . . . are ultra vires." Magee, Banks & Bkg. p. 21. Legislation regulating the conduct of banks has not been enacted solely, though, doubtless largely, out of regard for the interest of depositors in banks; it rests "upon the broader base that the public welfare and the stability of public business and commercial relations depend, to a great extent, upon honesty and soundness in the banking business." Wirtz v. Nestos, 51 N. D. 615, 200 N. W. 525. The statutes prescribing the conditions under which banks are privileged to function and the manner in which they shall do business, must be construed with reference to the purpose underlying all regulatory measures and the public nature of the business regulated. Undoubtedly they should be fairly construed so as to permit an effectuation of the purpose the legislature had in view, to wit: to permit this specific kind of corporation, and no other person, to carry on the banking business in a manner consistent with the interests of general creditors, depositors and the public. A bank, of course, has such powers as are expressly given it; these are express powers. In addition, it may exercise certain powers which are incidental to those expressly given. The range of such powers is generally stated in the statute and is limited by fairly well defined principles. Only such *incidental* powers exist as are "necessary to carry on the business of banking;" § 5150, subdivision 7 Comp. Laws 1913; that is, such as are incidental to the powers expressly enumerated. See First Nat. Bank v. National Exch. Bank, 92 U. S. 122, 127, 23 L. ed. 679, 681; Talmage v. Pell, 7 N. Y. 328, 340. Clearly, this kind of corporation is created for a more limited and special purpose than is a corporation organized under the general statutory charter, for the purpose of conducting ordinary business. To it has been granted the exclusive privilege to do a specified business in a manner circumscribed by definite restrictions. It is wholly the creature of statute; and it does business by legislative grace. It is privileged to receive deposits, but in what manner is not expressly stated. May a bank exercise the statutory privilege to receive a deposit in the manner in which it was done in the case at bar, and invite

the public to deposit funds upon the security of the bills receiveable of the corporation?

Subdivision 7, § 5150, Comp. Laws 1913, reads as follows:

"To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, bills of exchange, drafts and other evidences of debt, by receiving deposits, by buying and selling exchange, coin and bullion, by loaning money upon real or personal security, or both; but no association shall transact any business, except such as incidental and necessarily preliminary to its organization, until it has been authorized by the secretary of state to commence the business of banking, and the secretary of state may withhold from any association his certificate authorizing the commencement of business, whenever he has reason to suppose that the shareholders have formed the same for any other than legitimate objects as contemplated by this chapter."

It is said that a bank may pledge its bills receivable to secure loans; that, by analogy, the power to secure a deposit in like manner exists. It is strongly urged that there is no real difference between a deposit in and a loan to a bank, that in either case the relation of debtor and creditor arises, and that, inasmuch as the bank may pledge its assets to secure a loan, it may in like manner hypothecate its bills receivable to secure a general deposit.

The doctrine that there is no difference between a loan and a deposit we cannot accept in all its implications. It is true that in law the two transactions have many characteristics in common; but so have other business deals which, nevertheless, are not identical in all their legal incidents. The striking fact remains, a fact which this court cannot ignore, that a real difference between a deposit and a loan has always been *assumed,* as a matter of custom in the banking business itself, and in all legislation dealing with the subject since statehood.

We are warranted in taking judicial notice of the fact that in the banking business, it has been and still is, customary to treat loans and deposits as distinct and essentially dissimilar transactions. Without going into details, this fact is evidenced by methods of bookkeeping, and of making reports of the financial condition of the bank, both to private individuals, through the press or otherwise, and to the public

examiner. Originally, one of the main functions of a bank was to receive money deposits, or valuables for safe-keeping (see Oulton v. German Sav. & L. Soc. 17 Wall. 117, 21 L. ed. 619), and this early concept of a bank's primary office has, in a large measure, been recognized by custom in the business, and has influenced the course of legislation upon the subject.

In this jurisdiction pertinent legislation has at all times recognized a distinction between a loan and a deposit. Since 1879, it has been a criminal offense for an insolvent bank to receive deposits. The primary purpose of this provision is obviously the protection of prospective depositors. On the other hand, by the overwhelming weight of authority, a bank has the power to borrow money to meet an emergency or exigency, such as threatened or temporary insolvency. See First Nat. Bank v. Michigan City Bank, 8 N. D. 608, 80 N. W. 766. Regardless of the difficulties that may be met in any attempt to define the distinction, that its existence has been assumed is here strikingly demonstrated.

Again, § 9930, Comp. Laws 1913, prohibits the making of loans by certain officers of public funds under their control, and makes a violation of the act embezzlement; but deposits of such funds are expressly authorized, subject to certain restrictions and safeguards.

There is a distinct recognition of a difference between a deposit and a loan in the statutory definitions of these terms. Section 6067, Comp. Laws 1913, defines a loan as "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrowed." Section 6069, Comp. Laws 1913, provides that a loan is presumptively made upon interest unless it be otherwise expressly stipulated. Of course, the contrary is true of a deposit.

Section 6008, Comp. Laws 1913, defines a voluntary deposit as a deposit "made by one, giving to another with his consent, the possession of personal property to keep for the benefit of the former or of a third party. The person giving is called the depositor and the person receiving the depositary." Section 6012 provides that deposit for exchange is one in which the depositary may return "a thing corresponding in kind to that which is deposited." Under § 6013, the depositary must deliver the deposit on demand whether the deposit was made

for a specified time or not unless a lien has arisen. The legislature has thus distinctly recognized the distinction which once existed and which still exists, at least by usage and custom, between a deposit and a loan. In Allibone v. Ames, 9 S. D. 74, 33 L.R.A. 585, 68 N. W. 165, it was held that a general deposit made by a county treasurer in a bank could not be treated as a loan within a statutory provision similar to § 9930, Comp. Laws 1913, supra. The court referred to statutory definitions of a loan and a deposit, similar in all material respects to our statutes on the subject, and while not undertaking to state it, the court held that there was a distinction recognized by custom and usage, of which the courts must take notice. The court said that the statutory definitions indicated a distinction based upon the fact that a deposit was made primarily for the benefit of the depositor while a loan was for the benefit of the borrower. The benefit resulting to the depositary apparently was not considered to impart a controlling character to the transaction.

It is also to be noted that the Guaranty Fund Act assumes a difference between a loan and a deposit, the latter transaction being within while the former is without the guaranty provisions of the law.

In the instant case the parties themselves treated the transaction as a deposit, tried the case below on that theory, and the court found that a deposit was made.

Its existence once conceded, the power to borrow money necessarily imports that it may be exercised with all its customary and usual incidents. One of these is the practice to give security for loans. It is needless to say that the power to borrow money without the right to give security would be largely a barren prerogative and quite ineffectual in all the major transactions of business.

We think the conclusion necessarily follows that there is such a distinction between a deposit and a loan of money that no helpful analogy can be drawn, with respect to the power to pledge paper to secure a deposit, from the fact that the assets of a bank may be pledged to secure a loan. The former is an express power; the depositary function is, historically, different from that of discount or exchange. The power to borrow money, however, is an incidental as distinguished from an express power; a loan made to a bank is in no respects, so far as the present subject is concerned, different from a loan made by one

private person to another, and security, unless expressly prohibited by law, may be given by a bank to secure a loan, for which it has the power to contract, to the same extent and in the same manner as security may be offered or given by an individual in the same circumstances. That such security may be offered without express statutory permission in order to secure a general deposit in the bank, whether subject to check or on time, is a wholly different question. Historically it seems that the power to pledge for such a purpose was and is wholly foreign to the object for which a bank of deposit was created; and "originally the business of banking consisted only in receiving deposits. '. . .'" Oulton v. German Sav. & L. Soc. 17 Wall. 117, 21 L. ed. 619.

If the power exist to pledge bills receivable in order to secure a general deposit, it means, in all ordinary circumstances, that its repayment would be insured by the other and unsecured depositors of the bank; for, manifestly, a sale of the pledge, in the event of insolvency, would reduce the assets available to pay general depositors by the amount or value of the securities. The principle of subrogation would in but few, if any, cases be efficacious to avert this result. It is difficult to discover any principle on which the receiver of the bank could recover from the surety for the benefit of the depositors, after the obligation to pay the public deposit has been discharged by a sale of the pledge; and in case the public depositor proceeds first against the surety on the bond, the surety would have "the benefit of every security" held by the principal; Gilbertson v. Northern Trust Co. 53 N. D. 502, 42 A.L.R. 1353, 207 N. W. 42; and it would be subrogated to the rights of the public corporation in the securities. Comp. Laws 1913, §§ 6686 and 6687. In a proper case, indeed, the surety might require the creditor to first realize upon whatever security may have been given. See § 6683, Comp. Laws 1913. It follows that in virtually all imaginable circumstances, where default occurs, the pledge of assets would be at the expense of the general depositors. This result may be correct under the statutes, but the suggestion is confidently made that had it been intimated to the legislature that public deposits in banks, or the deposits of favored patrons, might be insured at the expense of general depositors—who derive no benefit from such deposits—the law would not have been passed in its present form. Soliciting of public deposits in large amounts and on time at low rates of

interest, with the privilege to use the funds thus deposited in the bank's own business, is so clearly profitable to the bank that we are not disposed to infer, in the absence of a clearly expressed purpose, that the legislature intended to throw the *burden* upon general depositors, while the *benefits* were enjoyed by the corporation.

It must be obvious that the banking laws now in force and the forms used and the practice followed in making and publishing reports on the condition of state banks, all approved by the State Banking Department, are as clearly calculated to deceive the public, as to the condition of the bank, as if they had been deliberately adopted for that very purpose, if the contention be sound that its bills receivable may be pledged to secure a general deposit. If the power exist, it is without limit or qualification in the statutes; and there is no requirement, legal or administrative, which removes the mantle of absolute secrecy from the transaction. The bank could—as every business man knows has been done on occasion—make the pledge agreement, keep the assets in its possession, and execute its receipt therefor to the favored depositor, all without a trace on the records of the corporation showing the transaction which actually took place. The bank could continue—as the insolvent doubtless did in the case at bar—to advertise a condition possessing all the superficial indicia of prosperity, and, notwithstanding, the cream of its assets be secretly pledged as security with favored depositors. Such a state of affairs would evidence a purpose to sanction gross fraud upon the public, which we think should not be attributed to the legislature by mere inference or implication. The fact that the banking department has never required a report of the nature or amount of assets pledged to secure deposits, approaches an administrative interpretation of the statutes against the existence of such power. We are all the more reluctant to hold that banks have this incidental power in view of the legislative intention, made manifest on every page of the statutes governing the business of banking, to throw every possible safeguard around the rights and interests of general depositors. Year by year, as experience has increased the wisdom of the lawmaker, these supposed safeguards have found their way into the law. The amount that may be loaned to any one person is definitely limited, interest rates regulated, and loans to officers are restricted; overdrafts are prohibited; receiving deposits when insolvent

is a felony; and periodical examinations are provided by a state department whose duty it is to enforce compliance with the statutes. All this regulatory legislation was primarily intended for the protection of depositors and of the public. This fact is universally known, and has been many times affirmed by this court. See Smith v. Rennix, 52 N. D. 938, 204 N. W. 843; Wald v. Wheelon, 27 N. D. 624, 147 N. W. 402; Wirtz v. Nestos, 51 N. D. 615, 200 N. W. 525.

Much has been said in vigorous phrase by the plaintiff, both on the oral argument and in the brief, respecting the alleged failure of the legislature to protect the interests of private depositors in state banks. It is not our province to defend that branch of the government. Yet, more might have been said to the point and with greater justice had the lawmaking body sanctioned the practice for which respondent contends. It is easy to imagine the vehemence with which that legislative delinquency would be denounced which permitted banks to favor certain, perhaps large and powerful, patrons at the expense of general depositors. In the light of the ruinous character of such a legislative policy the hurricane of indignation which would have broken forth would have been wholly justified. It is clearly contrary to every legislative expression on the subject of banking to assert that the law making branch of the state government has not made good faith albeit not wholly successful efforts to protect the patrons of state banks. Not ten years ago—in 1917—the legislature passed the Guaranty Fund Act, intended to insure all depositors and popularly acclaimed as efficacious to that end. An ex post facto wisdom, viewing the experience of this state in retrospect, may easily discover wherein these efforts of the legislature to forecast the future and guard against anticipated ills have fallen far short of the ideals of their promoters. The fact remains, however, that the sage has not yet appeared whose formula offers substantial hope of material improvement. The legislature can prescribe practices which, if indulged, may jeopardize the interests of depositors; that it has done; but it cannot fully insure against the consequences of dishonesty or of faulty judgment in banking officials, for banks must be managed by sentient persons who are liable to both.

The legislature has distinctly recognized the wisdom of public control over the pledging of bank assets in order to secure a loan; but at the same session killed a bill giving the power to pledge assets as

security for a deposit. In chapter 92, Sess. Laws 1925, § 1, a state bank may not "hypothecate any of its assets, except in accordance with . . . this act." The power to borrow is definitely restricted in this act; and the pledging of the bank's bills receivable as security for money borrowed is hedged about with limitations clearly intended in the interest of the general depositors and creditors of the corporation. While the principal object of the law seems to have been to regulate the exercise of the borrowing power and the use of the bank's assets in connection therewith, it is debatable if the general prohibition, quoted supra, be not sufficiently sweeping to constitute an express legislative inhibition against hypothecating assets to secure any sort of a deposit, a question, however, which we do not and need not decide. We call attention to this legislative action as evidence of a continuous policy to protect in every possible way the interests of depositors in state banks, and as warranting the inference that the legislature did not believe such power to exist with respect to deposits.

We are, therefore, of the opinion that the pledging of assets to secure a general deposit cannot be sustained as an "incidental" power, under § 5150, Comp. Laws 1913, "necessary to carry on the business of banking." An attempt to pledge goes beyond the charter powers of the corporation and is not an incident to the privilege to receive general deposits. Of course, the discussion here is confined to a general as distinguished from a "special deposit," or a "specific deposit."

The deposit in the case before us was of county funds. Cogent reasons, in addition to those suggested with respect to the power to hypothecate assets to secure a general deposit, condemn the transaction of pledge as beyond the charter power of the bank and of the county. The manner in which a public deposit must be secured is prescribed in detail in chapter 199, Sess. Laws 1923. It is there provided that all "funds of public corporations" shall be deposited in "banks which have been duly designated as depositories of public funds as provided in this act;" that no deposit shall be made, except in the Bank of North Dakota, until the depository "shall furnish a bond . . . in an amount that shall at least equal the largest deposit, that may be made in such depository;" that the "board of [the] public corporation involved" may require, in lieu of a personal bond, a "surety bond" equal to the "amount of the funds such bank may receive." It is made the duty

of the board to examine all bonds "at its regular meeting in July of each odd numbered year," and to require new bonds whenever necessary.

The language of this act is explicit. It is the mandatory duty of the public board to require and of the depository to furnish an adequate bond, personal or surety, in the discretion of the board, before one dollar of public money may be deposited in the bank. The language of this chapter discloses an eager purpose to protect public corporations against loss due to the insolvency of their depositories. At this juncture, however, sight must not be lost of the fact that the legislative purpose to protect the interests of general depositors in banks has been no less unequivocally expressed since the territory first legislated on the subject. It would be a gross perversion of every principle of statutory construction to effectuate the purpose of chapter 199, Sess. Laws 1923, supra, viz.: to protect public funds, without equal regard to the settled legislative policy, to safeguard to the utmost degree the rights of general depositors, which has informed the major portion of all legislation on banking in the territory and the state, for approximately half a century. We are not disposed to read into the depository law a purpose to safeguard the interest of the public patron of a bank at the expense of the private citizen who deposits his savings therein. If public boards do their full duty under the law and require an adequate personal or surety bond and diligently re-examine the same as directed in the statute, public funds would be rendered quite safe in substantially all forseeable circumstances without the slightest detriment to the public or to general depositors. It was not the purpose of the legislature, when the depository law was enacted, to make it possible for a bank or a public board to lessen in the least the protection which the law had always intended to accord general depositors; or to increase the hazard more or less incidental to the deposit of money in banks by individuals.

In the case at bar the bank and the public corporations attempted to depart from the manner which the legislature deemed best calculated to insure the safety of public funds, and the bills receivable of the bank were pledged to secure the deposit. Given an adequate surety bond, approved by the board or by the district judge, the bank became a qualified depository and the board could not refuse to recognize it, as such merely because it did not also pledge its assets as additional

security. Section 7, chapter 199, supra. . The board and the corporation were without power to require or make such a pledge. The legislature has prescribed the mode in which a bank may receive and a public corporation make a deposit of public funds. That mode is by a personal or surety bond as security. This statute is, of course, a part of the corporate charter, insofar as it relates to the exercise of power by a bank. The power is express, not incidental or implied. The rule seems to be that when a law prescribes one mode of exercising an express power or privilege, it implies an inhibition to exercise the given power in any other way. See Head v. Providence Ins. Co. 2 Cranch, 127, 2 L. ed. 229, per Marshall, Ch. J.; Fridley v. Bowen, 87 Ill. 151; Fowler v. Scully, 72 Pa. 456, 13 Am. Rep. 699.

Nor does it appear that the board of county commissioners required the pledge to be made. Perhaps some county official took it upon himself to demand it. The board approved the personal bond furnished by the bank and its minutes so show. It was without power to impose any new or other conditions than those prescribed in the statute with which the bank must comply before it could qualify as a depository. Neither did the bid contemplate any security other than the bond in acceptable form with satisfactory sureties. The resolution adopted by the board of directors of the bank authorized a bid in conformity with the statute, chapter 199, Sess. Laws 1923, but was wholly silent upon the subject of "collateral security to the bond." The record clearly shows that the pledge was wholly gratuitous, one which the board could not require or the bank make, even had the latter been authorized by the directors. It is no part of the contract of deposit; and the pledge is not in any legal sense a part of the consideration for the deposit. We think that this fact is of importance in considering the legal effect of the attempted pledge.

We are next required to determine the effect of this attempted exercise of a power which the bank did not possess.

The validity of the pledge is here challenged by the receiver. He represents more than the insolvent bank; he represents the creditors and general depositors of the bank. 1 Michie, Banks & Bkg. § 77 (3b). The latter are innocent parties and have equities which are superior to those of the plaintiff, against whom the defense of ultra vires is interposed. See Lyons v. Benney, 230 Pa. 117, 34 L.R.A.(N.S.) 105, 79

Atl. 250. As between the creditors and depositors of an insolvent bank, whose contractual relation with the corporation was created lawfully —intra vires—and the plaintiff, whose contract of pledge was ultra vires of the bank and unlawful, the former must be preferred, and the rule is that they are not estopped to assert the want of power. See Bank of Chattanooga v. Bank of Memphis, 9 Heisk 408; Vallely v. Devaney, 49 N. D. 1107, 194 N. W. 903; Niblack v. Feldman, 204 Ill. App. 443,; 7 C. J. 736; 34 Cyc. 239 and 391; High, Receivers, 4th ed. § 320; Atty. Gen. v. Guardian Mut. L. Ins. Co. 77 N. Y. 272, 275; Talmage v. Pell, 7 N. Y. 328. It is important, also, to keep in mind the fact that Divide county is a political subdivision of the state; and that it "may speak and act only in the manner and in the matters prescribed by the legislature in statutes enacted pursuant to constitutional authority." McHenry County v. Northern Trust Co. 51 N. D. 646, 200 N. W. 893. If it was without legal capacity to enter into an engagement which would, in effect, create a class of preferred depositors in banks, contrary to the policy of express law and the deliberate purpose of the legislative assembly, the courts will not, in the circumstances here disclosed, aid the county in the execution of a design branded as unlawful by the legislature.

We think that chapter 199, Sess. Laws 1923, the depository law, and other legislation to be later adverted to, must be held to evidence expressly the policy of this state with respect to the deposit of public funds and the manner in which such deposits must be secured. It is manifestly contrary to that policy for a bank to secure this class of deposits at the expense of the general depositors. The legislative purpose is clear beyond peradventure. It was not intended that the public should occupy the position of a preferred creditor, to the detriment of private depositors, in the event of the insolvency of the depository, or that such a result could come about by secret agreement between the parties. Section 5779, R. C. 1899, and § 7387, R. C. 1905, made debts owing certain public corporations preferred claims when a bank was dissolved through forfeiture of the corporate franchise. This preference was removed by amendment in 1911 (Sess. Laws 1911, chap. 101), probably suggested to the senator from Nelson county, who was a joint author of the bill, by the situation disclosed in the case of State ex rel. Miller v. People's State Bank, 22 N. D. 583, 135 N. W. 196,

and no such right of preference has since existed. See § 8007, Comp. Laws 1913. The policy of preferring public corporations as creditors of insolvent banks was definitely and consciously abandoned in 1911. Thereafter the public must look to the security of bonds furnished by duly designated depositories. Prior to the abandonment of the policy of preference, public funds on deposit in banks were secured by bonds, and by a species of inchoate lien upon all the bank's assets, and, of course, in actual practice, at the expense of the general depositors and creditors of the corporation. See State ex rel. Miller v. People's State Bank, supra, where this situation appears. We are of the opinion that the attempted agreement of pledge was "contrary to the policy of express law," and consequently "unlawful," within § 5922, Comp. Laws 1913; and that the privilege to receive deposits of public funds was, in the case at bar, exercised in a manner contrary to the public policy of this state. Smith v. Rennix, 52 N. D. 938, 204 N. W. 843; Oakes Nat. Bank v. Farmers State Bank, 52 N. D. 49, 201 N. W. 696. See also Peck v. Levinger, 6 Dak. 54, 50 N. W. 481. In short, the pledge agreement was unlawful, not merely in the sense that in making it the bank and the county exceeded their charter or statutory powers, but also in the sense that it was against public policy.

We need not embark further upon that sea of conflict and confusion charted in the law under the general title *ultra vires*. The contract which a court of equity is here asked to enforce was not only impliedly forbidden, but it was also contrary to a well defined legislative policy. In such circumstances, the authorities with substantial unanimity refuse to give any relief thereunder; and such is the necessary result of the recent holdings of this court. See Oakes Nat. Bank v. Farmers State Bank, 52 N. D. 49, 201 N. W. 696; Smith v. Rennix, 52 N. D. 938, 204 N. W. 843; State ex rel. Hadley v. Bankers Trust Co. 157 Mo. App. 557, 138 S. W. 669; West Penn Chemical & Mfg. Co. v. Prentice, 150 C. C. A. 153, 236 Fed. 891; 14 C. J. 309.

Upon the question of power to pledge assets to secure a deposit, not much aid can be derived from the authorities. In Richards v. Osceola Bank, 79 Iowa, 707, 45 N. W. 294, and in McFerson v. National Surety Co. 72 Colo. 482, 212 Pac. 489, the exercise of such power was upheld. The holdings, however, are virtually in syllabic form, and no indica-

tion appears by what process of reasoning the courts were led to the conclusion reached.

In Commercial Banking & T. Co. v. Citizens Trust & G. Co. 153 Ky. 566, 45 L.R.A.(N.S.) 950, 156 S. W. 160, Ann. Cas. 1915C, 166, we find a well considered discussion of the subject. Under statutes in no material aspect different from ours, that court refused to sanction the practice of pledging assets to secure a deposit. The reasoning and conclusion of the Kentucky court reflect, we think, the sounder view. See also Leonard Co-op. Creamery Asso. v. First State Bank, 168 Minn. 28, 209 N. W. 632.

It is said that this court must leave the parties to the illegal contract where it finds them, and that the receiver will not be permitted to recover the securities. To be left where and as found is precisely all the county can desire—with the illegally obtained collateral in its possession. In some way, which does not clearly appear, the receiver, although he represents the *depositors* and it is his duty to protect their interests, is supposed to be estopped from recovering the possession unless he first pays the money, or "deposit," which the *bank* received at the time when it and the county entered into the unlawful arrangement.

It appears to me that this position fails to take note of the status of the receiver of an insolvent bank. He is an arm or officer of the court appointing him; yet at the same time, he represents the creditors and stockholders of the corporation in more than a merely theoretical or academic sense. Viewed from this standpoint, his status is such that it is his duty to vindicate and protect the rights of the depositors. Under the law they have the legal right to demand that the assets of the bank shall not be pledged to secure favored depositors. As said in Re American Slicing Mach. Co. 125 S. C. 214, 118 S. E. 305, "the court will see that, in the distribution of the assets of the corporation, it will be effected with proper consideration for the legal and equitable rights of all concerned." It is the duty of the receiver to administer the estate for the benefit of those who may ultimately establish a right to share in its distribution; and he must assert the equitable as well as the legal rights of the creditors. See generally 23 R. C. L. pages 7 and 8, and cases cited.

This court has adopted the view that the receiver of an insolvent

bank, in addition to being an officer of the court, represents the *creditors* —depositors—as well. We, and the courts generally, have distinctly recognized this dual aspect of the receiver's character. Nor are the interests of the depositors and of the corporation by any means always wholly identical. Here a bank has illegally—in violation of positive statutes intended to protect depositors in banks—induced a county to violate another statute—also enacted in execution of the purpose to protect the interests of depositors—and secured a deposit of public funds by delivering a quantity of bills receivable as collateral; the county seeks to foreclose the pledge—with a double taint of illegality upon it—after the bank has become insolvent and is in the hands of a receiver to be wound up for the benefit of its creditors—who had nothing to do with the consummation of the unlawful scheme and were powerless to prevent it. The basis of the rule that the courts will leave the parties to an illegal contract where it finds them, is that it will not aid or reward a wrongdoer. Here the depositors are guilty of no wrong; shall they be punished for the misdeeds of the guilty? When the wrong was done, they were powerless to speak or prevent it; now an officer of the court is charged with the duty of protecting their interests. Shall we say to him that there is no remedy whereby the innocent may be protected from the consequences of the unlawful conduct of others? Section 22 of our Constitution provides that the "Courts shall be open, and every man for every wrong done him . . . shall have remedy by due process of law . . ." And yet it is said that the court after finding the injury can only slap the defunct bank and the delinquent county on the wrist, and say to the depositors: "We must leave you where we find you; we can do nothing because the transaction was illegal and you have not returned something which *not you* but the *bank* got from the plaintiff." To state the position ought to be sufficient to demonstrate its utterly untenable character. Such a holding would be a confession of judicial impotence to which this court is not prepared to subscribe. It would mean a notice to the people of this state that we are alike powerless to correct the wrongs which have been committed in the past and to prevent their repetition in the future. Once the parties are successful in executing their unlawful purpose, the victims of the legal fraud, although they are also the beneficiaries of the statutes which have been flouted, are helpless, and this court can do no more

than convert itself into a debating society where legal theories may be expounded without practical or useful results. A tribunal without power to do justice is not a court of equity, but an academy. If we are powerless to give effect to the plainly expressed purpose of the legislature to protect depositors, it is a usurpation to assume the name and put on the semblance of a court of equity.

It follows that the plaintiff has no right to foreclose the pledge or to retain the assets which the bank attempted to hypothecate. In so far as the judgment below went against the receiver and authorized a foreclosure of the pledge, it must be reversed. Of course this conclusion does not affect the judgment against the sureties from which no appeal is taken; or the rights of the county to follow the funds into the hands of the receiver, if the evidence in the case (which is not before us) is such as to justify a finding that the receiver holds the same or any part thereof as trustee for the plaintiff county. What the rights of a county in this regard may be cannot be determined from the record presented on this appeal.

It follows, from what has been said, that the judgment of the trial court, in so far as it decrees or authorizes a foreclosure of the pledge, must be and is hereby reversed.

CHRISTIANSON, Ch. J., and BURKE, J., concur.

BIRDZELL, J. (concurring). I am in entire accord with the holding in the principal opinion herein that there has not been conferred upon banking corporations in this state either express or implied power to pledge their assets as collateral security for deposits. It seems to me that this results necessarily from the application of elementary principles. No such power is expressly conferred and, as pointed out in the principal opinion, it may not be held to have been conferred by implication unless it may be said to be an incidental power which is necessary to the carrying on of the business of banking. It is a matter of common knowledge that a banking institution subserves the public convenience as a place for the depositing of money by those who have sufficient confidence in its stability to depend upon its general credit for repayment. The depositors in a bank as a whole are made up of those who thus deposit their money; and the situation is exceptional

55 N. Dak.—5.

where one contemplating a deposit exacts collateral security as a condition of making it. While the soliciting of deposits may be in furtherance of the business of banking, the solicitation of a particular deposit, accompanied by a proffer of collateral, is, so far from being a step necessary to the carrying on of the banking business, a harbinger of approaching insolvency. If known to the depositors generally, it would result in withdrawals or requests for similar security. Instead of being an incidental power necessary to the carrying on of the banking business, it is rather a power which, if known to have been exercised in particular cases, would speedily result in loss of public confidence to an extent that would spell certain disaster to the enterprise. I am clearly of the opinion that, in the absence of express power to pledge assets as security for a general deposit, it may not be said to exist as an incidental power necessary to the carrying on of the business of banking.

While agreeing that the judgment appealed from should be reversed, the record here is in such shape that I have some doubt as to whether the judgment should be entered in the form directed in the principal opinion. The pleadings and the findings are in such shape as to raise a strong inference that the securities are held by the county in lieu of money illegally deposited or loaned for a particular purpose. While I agree that there should be no decree authorizing the foreclosure of the pledge as a regular transaction, the denial of such relief, being favorable to the defendant, might well be upon terms which would require the defendant to do equity. As indicated in the principal opinion, what the rights of the county are cannot be determined from the record, and equally it may be said the record is silent as to the terms upon which equity should protect the defendant against a foreclosure of the pledge or compel a surrender of the securities.

NUESSLE, J. I cannot concur in the result reached by Judge Johnson in his opinion.

This appeal is taken on the judgment roll. The findings of the trial court are before us and we cannot go beyond them. The trial court found that the First State Bank of Wild Rose was designated as a depositary for Divide county in September, 1923; that thereafter the bank procured and filed a personal bond as such depositary; that on

October 18th, 1923, the deposit here. involved was made by Divide county; that "as a part of the negotiations leading up to the use of defendant bank as a depositary, the . defendant bank agreed to pledge as collateral security for the repayment of. such moneys as the county might deposit in said bank, the following certificates of indebtedness then owned by said bank, to wit: (the securities here sought to be foreclosed), which certificates were in addition to said bond as a part of the same transaction; that said agreement was carried into effect and said certificates of indebtedness duly pledged with and surrendered to the county as collateral security as aforesaid, and that upon execution of said bond and pledging of said certificates of indebtedness, the county did on October 18th, 1923, deposit in said bank the sum of $6,500, and for which sum the bank issued to the county its certificates of deposit" (on which this action is brought).

Of course we are bound by these findings. So the only conclusion to which we can come is that the deposit was made before the bond was effective and that simultaneously with the filing of the bond and as a part of the same transaction, the bank of Wild Rose pledged as collateral the certificates of indebtedness which the plaintiff now claims, and that as a result of the pledging of these collaterals the deposit was made in the bank. While the findings do not say so, we must assume that this was done by reason of an understanding with the proper county authorities. It further appears that these certificates totaled $6,475. The amount deposited was $6,500, or $25 more than the total of the certificates. The bank received the money; the county the certificates.

As I read Judge Johnson's opinion it holds that the transaction between the county of Divide and the Bank of Wild Rose was a deposit transaction and not a loan transaction; that there is such a distinction between a deposit and a loan, that while a bank has either the express or implied power to pledge its assets as security for a loan, it has no such power to pledge them as security for a deposit; that not only has it no such power but to do so is prohibited and contrary to the express policy of the law; that therefore such transactions are not only ultra vires, but are unlawful as well; and that no relief thereunder or therefrom will be awarded by the courts; that it is the policy of the law to protect depositors of banking institutions; that when a banking institution becomes insolvent and a receiver therefor is appointed, consistent

·with such a policy the receiver stands in a better position than the bank itself would occupy with reference to transactions which violate those statutes and policies having in view the protection of depositors; that the principle amounted in the case of Vallely v. Devaney, 49 N. D. 1107, 194 N. W. 903, is applicable in the instant case to the extent that the receiver may set up the invalidity of the transaction and repudiate it, and while retaining that which the bank received under the transaction, secure back that which it gave.

I do not challenge the conclusion reached by Judge Johnson that a bank has no power to pledge its assets as security for a deposit made with it, but I do think that this conclusion is not material to a determination of the case. It seems to me that whether the transaction here involved was merely ultra vires, or whether it was prohibited and unlawful, can make no difference with reference to the rights of the county of Divide with respect to the security which it received for its deposit. The fact remains that the bank received and retains the money; the county has the securities which were given to it in return for the deposit. To hold that the bank may retain the $6,500 which it received and recover back the securities which it gave for the money, is abhorrent to natural justice. The fact that it is the receiver who now asserts his rights to the securities can make no difference. A receiver takes the estate of an insolvent for the benefit of the creditors. He is, in fact, an assignee and stands in the shoes of the insolvent with the same rights and obligations that the latter had at the moment of insolvency. This rule applies as well to receivers of insolvent banks as to receivers of other insolvents. See Gilbertson v. Northern Trust Co. 53 N. D. 502, 42 A.L.R. 1353, 207 N. W. 42. And, on the other hand, where a transaction is malum prohibitum the law will not lend its aid to either of the parties thereto. It will leave them where it found them. Neither may invoke the law to break the law. See Oakes Nat. Bank v. Farmers State Bank, 52 N. D. 49, 201 N. W. 696; Smith v. Rennix, 52 N. D. 938, 204 N. W. 843; Jarski v. Farmers' & M. State Bank, 53 N. D. 470, 206 N. W. 773; Emanuel v. Engst, 54 N. D. 141, 208 N. W. 840. It seems to me that the mere fact that the Wild Rose Bank has, since this transaction was consummated, become insolvent, and is now in the hands of the defendant Baird, as receiver, can make no difference in the application of this latter principle. If,

for instance, in the Jarski Case, supra, the bank had bought the land from Jarski and had given to him as consideration therefor securities owned by the bank, and thereafter the bank had become insolvent and the receiver had sought to compel a return thereof, certainly this court would not have said that because the transaction was unlawful and securities must be returned to the bank, the bank permitted to retain the land, and Jarski compelled to file his claim and share rateably with the other creditors. Such a case would be parallel to the instant case. Judge Johnson, however, reasons that because in the instant case the bank is insolvent, and Baird, as receiver of the Wild Rose bank, claims the securities, this principle does not apply. He bases this distinction upon the rule laid down in the case of Vallely v. Devaney, supra. I think, however, that this distinction or exception, is not justified by the rule in the Vallely case. In the latter case Devaney gave his note to the bank without consideration and with the understanding that he should not be required to pay it. He did this for the purpose, known to him and to the bank, of swelling the apparent assets of the bank and deceiving the examiner. This note remained in the possession of the bank and was there when the bank became insolvent and Vallely as receiver took charge. Vallely sued upon the note and this court held that Devaney was estopped to set up lack of consideration or any collateral agreement that he might have had with the bank. When he gave the note with the known purpose of deceiving the bank examiner he knew that it was a fraud upon that official and upon the public generally who might, and who did, make and keep deposits in the bank upon the strength of its apparent sound condition. That case is far different from the one we have here. Here the bank, through its receiver, seeks to keep that which it received and to recover back that which it gave. It does not appear that either the bank or its depositors were in the least prejudiced by the transaction. On the contrary it does appear that both were benefited for the bank had the money, where before it had only the certificates. Unquestionably, the bank might have sold the certificates even at a discount; it might have pledged these same certificates for a loan in the identical amount of this particular deposit. In other words, it might lawfully have done the same things that were done; that is, exchange the certificates for the money, except that in case of sale it would have given no evidence

of indebtedness, and in case of loan a note instead of a certificate of deposit. I am not questioning, however, the distinction between a loan and a deposit that is elaborated in Judge Johnson's opinion; nor the existence of charter power to pledge securities in the former transaction and its absence in the latter. But the effect of pledging these assets for deposit could not tend to deceive the bank examiner, because the certificates were transferred to the possession of Divide county. There is no statute requiring banks to report the amount of assets pledged for loans, and the examiner can determine the amount pledged for deposits as readily as he can the amount pledged for loans. It is simply a matter of examination in both cases. There was no intention on the part of Divide county to deceive any examining officer or to induce the public to believe that the bank was sound when it was not, or that its assets were different from what they in fact were. Had the county, after receiving the certificates, turned them back to the bank with the idea that they should remain among its apparent assets for the purpose of deceiving the examiner, the principle in the Vallely case might be applicable, waiving the question of how far the county might be bound by any such fraudulent acts on the part of its officers. But that is not the case here.

The county of Divide has the certificates. They are payable to the holders. The county received them in good faith, though under a contract not sanctioned by the law. The maker of the certificates cannot challenge the right of the holder to collect them. The defendant Baird cannot do so, if my conclusions as above set out are correct, since he repudiated the contract and refused to return that which the bank received for them. Therefore, the judgment of the trial court, though apparently it affords affirmative relief by way of foreclosure, was in effect right and should be affirmed.

## On Petition for Rehearing.

Per Curiam. In a petition for rehearing counsel again urge the view that a bank may lawfully pledge assets to secure a deposit, whether the deposit be of private or public funds. Further consideration of this question in the light of the petition has not resulted in the alteration of the views previously expressed by the majority of the court.

The petitioner further urges that it should not be precluded from foreclosing the collateral pledge in view of the fact that the bank had not returned the deposit or otherwise offered to do equity. In the record before us, which consists of the judgment roll, there are no facts found which in our opinion support the judgment of the court below authorizing a foreclosure of the pledge, and it was held in the original opinion that this portion of the judgment must therefore be reversed, one concurring judge, however, believing that the defendant might well have been required to do equity as a condition to the entry of a decree thus favorable to it. In the principal opinion it was specifically stated, however, that the reversal of this portion of the judgment should not affect "the rights of the county to follow the funds into the hands of the receiver if the evidence in the case is such as to justify a finding that the receiver holds the same or any part thereof as trustee for the plaintiff county," and it was expressly recognized that what the rights of the county might be could not be determined from the record before us on appeal. Whatever difference of opinion there may be as to the form of the decree, we are agreed that the substantial rights of the county as cestui que trust are preserved (see Grand Forks County v. Baird, 54 N. D. 315, 209 N. W. 782) and that the petition for rehearing should be denied. It is so ordered.

JOHNSON, J., having ceased to be a member of the court, does not participate.

BIRDZELL, Ch. J., and CHRISTIANSON and BURKE, JJ., concur.