## Professional Service Credit Association, Inc., v. O'Hara, Secretary of Commonwealth, et al.

*John H. Fertig* and *R. F. Lehman*, for petitioner.

*H. J. Woodward*, Deputy Attorney General, and *Claude T. Reno*, Attorney General, for defendants.

WICKERSHAM, J., November 15, 1940.—In this action the Professional Service Credit Association, Inc., petitioner, seeks to compel the Secretary of the Commonwealth and the Department of State, respondents, to issue to it a certificate of authority to do business in this Commonwealth as a foreign business corporation, in accordance with article X of the Business Corporation Law of May 5, 1933, P. L. 364; and has procured an alternative

writ of mandamus directing respondents to show cause why a peremptory writ should not be awarded as prayed for. The matter is now before us on motion of respondents to quash the alternative writ heretofore awarded.

The petition sets forth that petitioner is a New York corporation; that the character and nature of its proposed business, as stated in its application for a certificate of authority to do business, and as set forth in exhibit "A" attached to the petition, is "the purchase of commercial paper and accounts of doctors, dentists and hospitals; and the collection, adjustment and settlement of such commercial paper and accounts, either as principal or as agent for doctors, dentists and hospitals."

The petition further sets forth that petitioner filed its application for a certificate of authority to do business in this Commonwealth as a foreign business corporation; that said application was denied by respondents under section 4 of article I of the Business Corporation Law, supra, for the reason that the Department of Banking had concluded that the proposed business of petitioner was within the purview of the Consumer Discount Company Act of April 8, 1937, P. L. 262, over which the Secretary of Banking exercises jurisdiction.

Petitioner prayed for the issuance of a writ of alternative mandamus directed to respondents to show cause why a peremptory writ should not issue as prayed for. The motion to quash the alternative writ followed, in which motion it is alleged that petitioner's business methods are not clearly set forth in the petition; that the proposed business of petitioner may not be conducted by a foreign corporation; and the type of business proposed by petitioner constitutes banking within the meaning of the Banking Code, and, therefore, is prohibited under the Business Corporation Law of this Commonwealth.

### Questions involved

1. Is the type of business petitioner proposes to do in this Commonwealth, as established by the exhibits to the

petition, a type regulated by the Consumer Discount Company Act of 1937, supra, which type of business may not be engaged in by a foreign corporation under the express terms of section 3 (*a*) of the act?

2. Does the type of business petitioner proposes to do in this Commonwealth constitute banking within the definition of section 2 of the Banking Code of May 15, 1933, P. L. 624, as amended; and as a consequence make the business subject to the supervision of the Department of Banking, and which business, under the terms of sections 4 and 1002 (1) of the Business Corporation Law, supra, neither a domestic nor a foreign business corporation may engage in?

*Discussion*

The plan of business petitioner proposes to do in this Commonwealth, as set forth in the petition and the exhibits attached thereto, is, briefly stated, as follows:

A doctor, dentist, or hospital having business relations with petitioner will require his or its credit patients to sign a promissory note for the amount of the professional fee, agreeing to pay the amount in monthly instalments. The note is to be executed upon a form supplied by petitioner, as illustrated by exhibit "F" of the petition, and is to be payable to the doctor, dentist, or hospital, or to his or its order, payable at petitioner's office.

When the doctor has had his patient sign such note for his professional fee, petitioner takes an assignment of— or, as petitioner puts it, purchases — the note from the doctor at a discount, as explained in petitioner's circular of information attached as exhibit "H" to the petition. After this transfer the patient who signed the note makes all promised payments directly to petitioner.

When the note is transferred by the doctor to petitioner the doctor receives the face of the note less discount at rates set forth in said exhibit "H", which rates vary according to the face amount of the note and according to the terms of the patient's obligation, in all cases the rate being far in excess of six percent.

After petitioner takes the note from the doctor and determines the discount, the doctor receives a check in the face amount of the note, less discount, the form of the check employed by petitioner being illustrated in exhibit "G" of the petition.

The doctor cannot cash the check without endorsement, and by endorsement he enters into a printed agreement which appears above his signature. The agreement appears in said exhibit "G", one of the terms of which is that the doctor will repay to petitioner in case the patient defaults upon the note, not only what he, the doctor, received from petitioner for the note, but the full face amount of the note, less any payments the patient may have made thereupon. By this agreement the doctor also empowers the petitioner's agents to endorse the note itself in his name and he undertakes all the liabilities of an endorser of the note, not only to petitioner, but also to anyone to whom petitioner may negotiate the note. And the back of the check also states that the check must be endorsed with the payee's personal signature. Consequently, in order to receive the amount of the note, less discount, the doctor must personally sign the agreement printed on the back of the check.

It, therefore, appears that all the essential features of a customary discount transaction, so long familiar to the law, are present in every transaction in which petitioner proposes to engage. In the customary and most familiar discount transaction A makes a note payable to B on order. B takes it to a bank, endorses it and receives the face value less discount at the rate of six percent. The bank may rediscount it at the Federal Reserve Bank or elsewhere. At all times B remains liable if A fails to pay the note, either to the bank or to such other person or corporation with which the bank may have rediscounted it.

In the instant case, the patient is in the position of A, as above illustrated. The doctor is in the position of B and petitioner is in the position of the bank. The patient

makes a note payable to the doctor or order. The doctor takes it to petitioner. The doctor may not endorse the note, but he receives for it a check for the face amount, less discount, and in order to cash the check he must sign on the back thereof an authorization to two persons designated by petitioner, empowering them to endorse the note in his name and on his behalf with the same effect as if he had endorsed it himself. Obviously, the effect of this is the same as if the doctor himself endorsed the note to petitioner; but apparently the reason for not requiring the doctor to endorse it himself is to enable petitioner to negotiate it further without itself assuming the liability of an endorser. Under this arrangement, further negotiation by petitioner is possible merely by endorsing the note in the doctor's name directly to the party rediscounting the note. Even if petitioner does not endorse the note in the doctor's name, either to itself or to a party rediscounting, the doctor, by cashing the check, also agrees to remain liable for the full amount of the note if the patient does not pay it, just as B, in the illustration above, remains liable to the bank if A does not pay.

It is the contention of petitioner, however, that the nature of the transaction is that of purchase rather than discount. We believe the outright purchase of commercial paper, while it may be at a reduction from the face value of the paper, contemplates no liability on the part of the seller if the obligor on the paper defaults. Here such liability is plainly contemplated in every case, and results from the doctor's signing the agreement, on the reverse side of the check, to remain liable, or from the endorsement placed on the note itself by the doctor's designated agents, or from both.

We are of opinion that the discount of a note, entailing as it necessarily does liability on the part of the endorser of the note to the endorsee in case of default by the maker, is an advance or loan of money by the endorsee to the endorser. See State v. National Credit Co., 236 Ala. 224, 181 So. 769, where it is stated: "Loans and dis-

counts are synonymous terms"; and National Bank v. Johnson, 104 U. S. 271, 276, 26 L. Ed. 742, where it is stated:

"Discount, as we have seen, is the difference between the price and the amount of the debt, the evidence of which is transferred. That difference represents interest charged, being at some rate, according to which the price paid, if invested until the maturity of the debt, will just produce its amount. And the advance, therefore, upon every note discounted, without reference to its character as business or accommodation paper, is properly denominated a loan, for interest is predicable only of loans, being the price paid for the use of money. . . . the terms 'loans' and 'discounts' are synonyms. It was so said in *Talmage* v. *Pell* (7 N. Y. 328) ; and in *Niagara County Bank* v. *Baker* (15 Ohio St. 68) the very point decided was that 'to discount paper, as understood in the business of banking, is only a mode of loaning money with the right to take the interest allowed by law in advance.' "

In Bon Homme County Bank v. Dakota National Bank, 50 S. D. 191, 208 N. W. 825, a situation essentially analogous to the one presented by the present petition was involved. Defendant bank had endorsed without recourse a number of notes to plaintiff bank. Collaterally, defendant agreed that plaintiff might charge the notes at maturity against its (defendant's) account with plaintiff. When defendant became insolvent, the true character of the transaction became an issue. It was held that the transaction was a loan from defendant to plaintiff, secured by the notes as collateral.

So here, in the instant case, the agreement on the back of the check to be used by petitioner in making payment to the doctor is a promise to pay money. The patient's note may be regarded merely as collateral security. It makes no difference whether the note is ever endorsed to petitioner. The doctor's promise on the reverse side of the check is for the repayment of money advanced, if the note is not paid. And there is no obligation upon peti-

tioner to sue the patient first, or indeed, to make any effort to collect from the patient. The doctor is liable on his own agreement to repay not only what was advanced to him, but highly usurious interest as well.

In any way the transaction can reasonably be regarded, we think it is a loan or advance by petitioner to the doctor. At all times he is liable for the principal and interest. From this fact there is no escape, however petitioner may have endeavored to disguise it.

Surely the legislature intended to bring such transactions within the purview of section 3(a) of the Consumer Discount Company Act of 1937, which provides:

"On and after the effective date of this act, no person, partnership, association, foreign business corporation organized under or by virtue of any laws other than those of this Commonwealth, nonprofit corporation, common law trust, joint-stock company, or any other group of individuals however organized, shall engage or continue to engage in this Commonwealth, either as principal, employe, agent or broker, in the business of negotiating or making loans or advances of money or credit, in the amount or value of one thousand dollars ($1,000) or less, and charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of six per cent (6%) per year on the amount actually loaned or advanced, or on the unpaid principal balances when the contract is payable by stated installments."

We are of opinion that the form of transaction here involved falls squarely within the said act, as petitioner is a foreign corporation and the business it proposes to do in this Commonwealth is tantamount to making loans or discounts in amounts of $1,000 or less, at a loan or discount rate in excess of six percent. The first question involved is, therefore, answered in the affirmative.

We will now consider the second question involved, whether the type of petitioner's business constitutes banking as defined in the Banking Code of 1933, and if so

whether petitioner is excluded from doing business in this Commonwealth.

The Banking Code of 1933, in article I, sec. 2, defines "banking" as follows:

" 'Banking' means discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; receiving money and commercial paper on deposit or for transmission; lending money on real or personal security; buying and selling gold and silver bullion, foreign exchange, coin, or bills of exchange."

It will be observed that the discounting of notes constitutes one phase of banking, and would bring petitioner, were it allowed to do business in this Commonwealth, under the supervision of the Secretary of Banking, as we have above held that the proposed plan of petitioner's business in this Commonwealth is the discounting of notes. We do not mean by this that an ordinary individual or company cannot, under certain circumstances, discount notes without constituting the individual or company a bank. However, the Consumer Discount Company Act of 1937 has conferred certain powers upon the Secretary of Banking in regard to the licensing and supervision of persons loaning or advancing money or credit in the amount of $1,000 or less. There is, therefore, by our present law, a limitation upon activities which apparently come within the realm in which petitioner wishes to operate. In other words, anyone might engage in the matter of discounting notes without constituting himself a banker as defined by the Banking Code, but the field of such activity is certainly narrowed by the Consumer Discount Company Act, and the proposed type of business of petitioner would appear to be well within the said act, because there is no question but that the loan or advance of money or credit in an amount less than $1,000 to people in need of medical care and attention will prove to be the chief business of petitioner.

As above stated, petitioner is a foreign corporation, and the discounts it proposes to allow in its plan of busi-

ness vary according to the face amount of the notes discounted, but in all instances they are far in excess of six percent (exhibit H). We again direct attention to section 3(a) of the Consumer Discount Company Act of 1937, which provides:

". . . no . . . foreign business corporation . . . joint-stock company, or any other group of individuals however organized, shall engage . . . in this Commonwealth . . . in the business of negotiating or making loans or advances of money or credit, in the amount . . . of . . . ($1,000) or less, and charge, collect, contract for or receive interest, discount . . . which aggregate in excess of . . . (6%) per year . . ."

And paragraph B of this section provides that domestic business corporations shall not engage in such business without first obtaining a license from the Secretary of Banking. To the limited extent covered by this act, the usury statute has necessarily been modified, but it has been modified only in favor of domestic corporations subject to regulation. See section 7 of the act, which provides:

"A license under the provisions of this act shall be issued only to a corporation organized under the Business Corporation Law of the Commonwealth of Pennsylvania."

Section 18 provides penalties as follows:

"Any person . . . foreign business corporation . . . who shall engage in the business of negotiating or making loans or advances of money or credit . . . of . . . ($1,000) or less, and charge . . . receive interest, discount . . . in excess of . . . (6%) per year . . . shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine . . . and/or suffer imprisonment . . . in the discretion of the court."

Even individuals are not accorded the benefits of the act, but are expressly excluded, as are foreign corporations.

Obviously the Secretary of the Commonwealth cannot be compelled to issue a certificate of authority to peti-

tioner to do a business in violation of the statute, as in article I, sec. 4, and subsec. (3), of the said Business Corporation Law of 1933 it is provided:

"This act does not relate to, does not affect, and does not apply to . . .

"Any corporation which, by the laws of this Commonwealth, is subject to the supervision of the Department of Banking . . ."

In article X, relating to foreign business corporations, it is provided in section 1002:

"The Department of State shall not issue a certificate of authority to any foreign business corporation:

"(1) If the application for the certificate of authority, hereinafter required by this article to be filed, sets forth any kind of business for the transaction of which a domestic business corporation could not be formed under the laws of the Commonwealth."

We are of opinion, therefore, that the motion to quash the alternative writ of mandamus should be sustained.

And now, November 15, 1940, it is ordered, adjudged, and decreed that the motion to quash the alternative writ of mandamus heretofore awarded is sustained, and the said writ is dissolved. Costs to be paid by petitioner.